**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DAVID SCOTT DETRICH, | No. 08-99001 |
| *Petitioner-Appellant*, | D.C. No.4:03-cv-00229-DCB |
| v. | |
| RYAN THORNELL, Director of Arizona Department of Corrections, | OPINION |
| *Respondent-Appellee*. | |

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted En Banc January 14, 2026
Pasadena, California

Filed June 17, 2026

Before: Mary H. Murguia, Chief Judge, and Sidney R. Thomas, Susan P. Graber, William A. Fletcher, Ronald M. Gould, Carlos T. Bea, Morgan Christen, Jacqueline H. Nguyen, John B. Owens, Bridget S. Bade, and Kenneth K. Lee, Circuit Judges.

Opinion by Chief Judge Murguia;
Concurrence by Judge Nguyen

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The en banc court affirmed the district court's denial of Arizona death row prisoner David Scott Detrich's habeas corpus petition under 28 U.S.C. § 2254.

The en banc court held that a claim is fairly presented to the state supreme court when the circumstances as a whole fairly apprise the state supreme court that the petitioner seeks from the supreme court some form of substantive or procedural relief with respect to that claim. Including the underlying petition in the appendix, without more, is insufficient.

The en banc court held that Detrich procedurally defaulted most of his guilt-phase ineffective assistance of counsel claims by failing to fairly present them to the Arizona Supreme Court, and that Detrich did not establish cause and prejudice to excuse those procedural defaults under *Martinez v. Ryan*, 566 U.S. 1 (2012).

The en banc court held that Detrich did not procedurally default his claim that trial counsel was ineffective for failing to retain a forensic expert to challenge a prosecution witness's testimony about the victim's gurgling sounds. Detrich contended that expert testimony would have undermined the witness's credibility, which in turn would have resulted in a different outcome at trial. The Arizona Supreme Court, however, reasonably concluded

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that Detrich was not prejudiced by counsel's failure to retain an expert for this purpose because overwhelming evidence, apart from the prosecution witness's testimony, supported the finding that Detrich murdered the victim.  Because the state court's conclusion is objectively reasonable, habeas relief is precluded under the Antiterrorism and Effective Death Penalty Act of 1996.  *See* 28 U.S.C. § 2254(d).

Detrich also contended that trial counsel performed deficiently at sentencing by failing to present additional mitigation evidence and by failing to challenge prosecution evidence showing that he committed the offense in an especially cruel, heinous, or depraved manner, which rendered him eligible for the death penalty.  The en banc court rejected Detrich's contention that the Arizona Supreme Court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in concluding that he was not prejudiced by trial counsel's alleged deficiencies.  The en banc court also rejected Detrich's assertion that the state court's decision was based on an unreasonable determination of the facts.  Section 2254(d) therefore precludes habeas relief on this claim as well.

The en banc court declined to grant a certificate of appealability on Detrich's claim that the Arizona Supreme Court applied an unconstitutional causal nexus test to mitigation evidence at sentencing, as Detrich did not make a substantial showing that it did so in his case.

Judge Nguyen concurred in all but one respect and concurred in the judgment.  She wrote that *Martinez* is a specific application of the cause requirement in *Coleman v. Thompson*, 501 U.S. 722 (1991), for overcoming procedural default and does not replace *Coleman*'s actual prejudice

requirement with a substantiality test. Here, however, the prejudice standard makes no difference.

## COUNSEL

Amy S. Armstrong (argued), Emily K. Skinner, Sam Kooistra, and Jennifer S. Bedier, Arizona Capital Representation Project, Tucson, Arizona; Gregory J. Kuykendall, Kuykendall & Associates, Tucson, Arizona; for Petitioner-Appellant.

Jason D. Lewis (argued), Deputy Solicitor General, Section Chief of Capital Litigation; Laura P. Chiasson and Jonathan Bass, Assistant Attorneys General; Kent E. Cattani, Chief Counsel; Capital Litigation Division, Criminal Appeals Division; Thomas C. Horne and Kristin K. Mayes, Arizona Attorneys General; Office of the Arizona Attorney General, Tucson, Arizona, for Respondent-Appellee.

# OPINION

MURGUIA, Chief Circuit Judge:

Arizona death row prisoner David Scott Detrich appeals the district court's denial of his 28 U.S.C. § 2254 federal habeas petition. Detrich contends that his attorney provided ineffective assistance during the guilt and penalty phases of his trial, in violation of his Sixth and Fourteenth Amendment right to counsel, and that the Arizona Supreme Court applied an unconstitutional causal nexus test to mitigation evidence at sentencing, in violation of his Eighth and Fourteenth Amendment right to individualized sentencing in capital cases. The district court denied habeas relief, and we affirm.

Detrich procedurally defaulted most of his guilt-phase ineffective assistance of counsel claims by failing to fairly present them to the Arizona Supreme Court. Detrich, moreover, has not established cause and prejudice to excuse those procedural defaults under *Martinez v. Ryan*, 566 U.S. 1 (2012). To establish cause under *Martinez*, Detrich must demonstrate a reasonable probability that the outcome of his state postconviction proceedings would have been different had postconviction review counsel raised the claims in that forum. *See Pizzuto v. Ramirez*, 783 F.3d 1171, 1178 (9th Cir. 2015). Detrich has not made this showing.

Detrich did not procedurally default his claim that trial counsel was ineffective for failing to retain a forensic expert to challenge a prosecution witness's testimony about the victim's gurgling sounds. Detrich contends that expert testimony would have undermined the witness's credibility, which in turn would have resulted in a different outcome at trial. The Arizona Supreme Court, however, reasonably concluded that Detrich was not prejudiced by counsel's

failure to retain an expert for this purpose because overwhelming evidence, apart from the prosecution witness's testimony, supported the finding that Detrich murdered the victim. Because the state court's conclusion is objectively reasonable, habeas relief is precluded under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d).

Detrich also contends that trial counsel performed deficiently at sentencing by failing to present additional mitigation evidence and by failing to challenge prosecution evidence showing that he committed the offense in an especially cruel, heinous, or depraved manner, which rendered him eligible for the death penalty. We reject Detrich's contention that the Arizona Supreme Court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in concluding that he was not prejudiced by trial counsel's alleged deficiencies. We also reject Detrich's assertion that the state court's decision was based on an unreasonable determination of the facts. Section 2254(d) therefore precludes habeas relief on this claim as well.

Finally, Detrich contends that the Arizona Supreme Court applied an unconstitutional causal nexus test to mitigation evidence at sentencing. Although the Arizona Supreme Court intermittently applied an improper causal nexus test during the timeframe in which Detrich was sentenced, *see McKinney v. Ryan*, 813 F.3d 798, 815 (9th Cir. 2015) (en banc), Detrich has not made a substantial showing that it did so in his case, *cf. Lee v. Thornell*, 118 F.4th 969, 993–94 (9th Cir. 2024); *Apelt v. Ryan*, 878 F.3d 800, 839–40 (9th Cir. 2017); *Greenway v. Ryan*, 866 F.3d 1094, 1095–1100 (9th Cir. 2017). We decline to grant a certificate of appealability on this claim. *See* 28 U.S.C. § 2253(c)(2).

## I.  Background

## A.  Trial and Direct Review

Detrich was charged with first-degree murder, kidnapping, and sexual assault in connection with the 1989 death of Elizabeth Souter.  *State v. Detrich* (*Detrich II*), 932 P.2d 1328, 1332 (Ariz. 1997).  His codefendant, Alan Charlton, was charged with first-degree murder and kidnapping, pleaded guilty to a single count of kidnapping, agreed to testify against Detrich in exchange for dismissal of the murder charge, and was sentenced to ten and one-half years in prison.  *Id.* at 1331 n.1.  Souter was Black; Detrich and Charlton are white.

At Detrich's first trial, in 1990, the jury found him guilty of first-degree murder, kidnapping, and sexual abuse, a lesser included offense of sexual assault.  *Id.* at 1332.  The trial court sentenced Detrich to death for murder, to twenty-one years in prison for kidnapping, and to four years in prison for sexual abuse.  *State v. Detrich* (*Detrich I*), 873 P.2d 1302, 1303 (Ariz. 1994).  The Arizona Supreme Court affirmed Detrich's conviction for sexual abuse but reversed his convictions for murder and kidnapping and remanded for a new trial on those charges.  *Id.*  In 1994, Detrich was tried and convicted a second time.  We summarize the evidence in the second trial below.

## 1.  Alan Charlton's Testimony

Charlton testified for the prosecution that he, Detrich, and William Carbonell, all of whom worked together at a wrecking yard in Benson, Arizona, went out drinking after work on Saturday, November 4, 1989.  After consuming a great deal of beer, Charlton and Detrich drove to Tucson, where they visited more bars and consumed more alcohol.

At one point, they stopped and picked up Souter, who was walking along the road. Detrich asked Souter whether she knew a place where they could purchase cocaine, and Souter directed them to a house where they could do so. Detrich and Souter went into the house, and Detrich purchased a "rock" of cocaine.

Charlton testified that he, Detrich, and Souter then drove to Souter's house. Detrich went into the kitchen and attempted to dissolve and inject the cocaine. Detrich became angry when these efforts were unsuccessful, and he directed his anger at Souter. Detrich was "screaming and hollering that the needle wasn't any good, or the cocaine wasn't any good, the needle wouldn't pick it up." Detrich entered the living room, grabbed Souter, held a knife to her throat, and told her, "Come on, bitch, we are going for a ride." As Detrich led Souter to the car at knifepoint, "[y]ou could see the terror in her eyes." Charlton, Detrich, and Souter got into Charlton's car. Charlton sat in the driver's seat, Detrich sat in the middle, and Souter sat up against the passenger door. Detrich instructed Charlton to drive, and Charlton did so.

Charlton testified that he looked to his right several times while driving. The first time he looked to his right he saw that Detrich was on top of Souter, "humping her." The second time he looked over he saw that Souter's throat had been cut. The third time he looked over he saw that Detrich was hitting Souter and trying to get her to tell him the name of the person who sold them the bad drugs. Detrich asked Souter three times, and each time Souter gurgled something in response. Charlton could not make out what Souter said. The fourth time Charlton looked to his right, Souter had stopped moving, and Detrich asked Charlton if he "wanted a shot of it, it is dead but it is warm, you want a shot of it?" Charlton told Detrich no. Detrich instructed Charlton to pull

over.  Charlton did so, and Detrich dragged Souter's body into the desert.  Charlton and Detrich then drove to Carbonell's house.  Charlton described Souter's killing to Carbonell the next day, and to the police a week later.

### 2. Tammy Winsett's Testimony

Tammy Winsett, who was present at Souter's home on the night of the crimes, also testified for the prosecution.  She testified that Souter arrived home with two men between midnight and one o'clock in the morning.  At one point, Charlton told Winsett that he had killed his ex-wife's lover and would do the same to Winsett if she betrayed him.  Later, Detrich became angry with Souter because of the bad drugs, held a knife to her neck, and told her that she was going to have sex with him.  "[Detrich] told [Souter] they could go in the room or do it right there, or they would do it his way, and she did not want to do it his way."  Winsett left the house with Souter's daughter Caprice to call for help.  On her way back to the house, Winsett saw Detrich and Charlton taking Souter to the car over Souter's protests.  Winsett heard Souter say "no" a couple of times.  Charlton was driving and Souter was in the passenger seat.

### 3. Gwen Souter's Testimony

Souter's daughter Gwen testified for the prosecution as well.  Like Winsett, Gwen was present at Souter's house on the night of the crimes.  While Winsett and Caprice interacted with Charlton and Detrich, Gwen stayed in her room in the back of the house with her infant daughter.  Gwen heard Souter and two men arrive at the house around midnight or one o'clock in the morning.  At one point, Gwen heard one of the men—not Charlton—say, "you must not believe me, I will kill you."  Around this time, Winsett and Caprice came to her door, scared and hysterical.  These

events terrified Gwen, who hid her daughter under the bed, climbed out of her bedroom window, ran a couple of blocks away, and telephoned the police.

### 4.  William Carbonell's Testimony

Carbonell appeared as a prosecution witness and testified that Charlton and Detrich arrived at his home around four o'clock in the morning on November 5.  Charlton and Detrich "looked like they had been in a terrible fight, like they butchered a cow."  Carbonell testified that Detrich was covered in blood, while Charlton had blood on his right side. *Detrich II*, 932 P.2d at 1332.[1]  Detrich told Carbonell that "he killed a girl"—"he had gone to some house . . . to get some drugs, and some bad drugs, and he grabbed the girl out of the house by knife point and jumped in the car and they left.  That is when he killed her."  Detrich told Carbonell that he killed the woman by cutting her throat with a knife. Carbonell ultimately reported the crimes to the police.

### 5.  Dr. Thomas Henry's Testimony

Dr. Thomas Henry, the medical examiner who autopsied Souter's body, also testified for the prosecution.  He testified that Souter suffered more than forty knife wounds, including numerous defensive-type wounds to her hands, as well as bruises throughout her body.  Three of the knife wounds were potentially fatal—one to the abdomen, one to the left side of the neck, and a deep cutting wound across the front

---

[1] Darci Bell, Detrich's sister, stated in a 2004 declaration that she washed Detrich's clothes the day after the murder and that they did not have blood on them.  *See Detrich v. Ryan* (*Detrich V*), 740 F.3d 1237, 1255 (9th Cir. 2013) (en banc) (plurality opinion) (discussing this evidence). Although Detrich discussed this evidence in his *Martinez* remand motion and in the briefs he filed during successive state postconviction proceedings, he does not mention the evidence in his current briefing.

of Souter's neck and throat.  None of the wounds would have rendered Souter immediately unconscious, but the most serious wound—to Souter's throat—would have killed her within fifteen to twenty minutes.  The combination of the wounds would have contributed to her dying even sooner. Dr. Henry found no evidence of sexual assault, but the absence of such evidence was not conclusive as to whether an assault occurred.

## 6.  Detrich's Defense

Detrich was represented by attorney Harold Higgins. Higgins presented two defenses: a mere-presence defense and a misidentification defense.  With respect to the misidentification defense, Higgins pointed to evidence that Winsett and Gwen Souter had initially told police that the man who threatened Souter looked or sounded Hispanic, which Detrich is not.

Detrich's mere-presence defense relied on testimony from Phillip Shell, who shared a jail pod with Charlton in 1990.  Shell testified in person at Detrich's first trial in 1990. At the second trial, in 1994, Shell's testimony was read into the record because Higgins was unable to arrange Shell's presence as a live witness.[2]  In Shell's telling, Charlton killed Souter because he was angry that Detrich "was kissing with a black woman . . . that had just ripped him off."  Charlton called Detrich "a Nigger lover" and referred to Souter as "[t]hat black bitch."  Charlton "was hoping that he was going to turn State's evidence" and "would say anything . . . he had to make up to get [Detrich] the death penalty."

---

[2] Whether Shell was willing to testify at the second trial is disputed.  We need not resolve that dispute to decide this appeal.

Charlton's estranged wife, Deborah Charlton, provided additional evidence of Charlton's racism.  She testified that Charlton disliked Black people and referred to Black people as "mud ducks."   She also testified that Charlton liked martial arts paraphernalia; owned two knives, one of which he routinely carried on his person; and had once brandished a knife and threatened to kill her if she left him.  On cross-examination, Deborah acknowledged that she had described Charlton as a nonviolent person at Charlton's sentencing.

### 7.  Verdict and Sentencing

The jury deliberated for an hour before finding Detrich guilty of first-degree murder and kidnapping.  On the murder charge, eleven jurors found Detrich guilty on a felony murder theory, nine found him guilty on a premeditation theory, and eight found him guilty on both theories.

The sentencing phase of the trial occurred in February 1995 and included a one-day aggravation-mitigation hearing and a one-day sentencing hearing.  To render a defendant death-eligible in Arizona, the prosecution must prove at least one statutory aggravating circumstance.  *Ring v. Arizona*, 536 U.S. 584, 593 (2002) (citing former Ariz. Rev. Stat. § 13-703(F)).   Here, the prosecution pursued a single aggravator (the (F)(6) aggravator), arguing that Detrich "committed the offense in an especially heinous, cruel or depraved manner."  Ariz. Rev. Stat. § 13-703(F)(6) (1994) (now codified at Ariz. Rev. Stat. § 13-751(F)(4)).  The (F)(6) aggravator encompasses a cruelty prong and a heinous or depraved prong.  "A murder is especially cruel if the jury finds the victim consciously suffered physical or mental pain and that the defendant knew or should have known that the victim would suffer."  *State v. Allen*, 513 P.3d 282, 326 (Ariz. 2022) (quoting *State v. Allen*, 460 P.3d 1236, 1243–

44 (Ariz. 2020)).  The term heinous or depraved, on the other hand, is used to describe "a defendant's vile state of mind and attitude at the time of the murder." *State v. Ross*, 886 P.2d 1354, 1361 (Ariz. 1994).  "This is generally assessed by reference to the defendant's words or actions both preceding and during the crime's commission." *State v. Robinson*, 509 P.3d 1023, 1038 (Ariz. 2022).  "Specifically, the jury must consider '1) whether the defendant relished the murder;  2) whether the defendant inflicted gratuitous violence on the victim; 3) whether the defendant needlessly mutilated the victim; 4) the senselessness of the crime; and 5) the helplessness of the victim.'"  *Id.* (quoting *State v. Murdaugh*, 97 P.3d 844, 856 (Ariz. 2004)).  "'[A] finding of either cruelty or heinousness/depravity will suffice to establish' the (F)(6) factor." *State v. Newell*, 132 P.3d 833, 850 (Ariz. 2006) (quoting *State v. Djerf*, 959 P.2d 1274, 1286 (Ariz. 1998)).

Detrich challenged his eligibility for the death penalty under *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987).  Under *Enmund* and *Tison*, "the Eighth Amendment permits imposition of the death penalty in the case of a 'felony murderer who actually killed, attempted to kill, or intended to kill'" or "'whose participation [in the felony] is major and whose mental state is one of reckless indifference to the value of human life.'" *Ross v. Davis*, 29 F.4th 1028, 1043–44 (9th Cir. 2022) (alteration in original) (quoting *Tison*, 481 U.S. at 150, 152). Detrich proposed five mitigating circumstances: diminished capacity based on voluntary intoxication; abusive background; lack of previous convictions involving serious injury or threat thereof; remorse for the victim; and the minimal sentence received by Charlton.

Regarding Detrich's abusive background and history of substance abuse, the record before the sentencing court included three statements from Detrich's sister, Diana Jo Stevens; a presentence report; a 1985 psychological report by Dr. Larry Zimmerman; a 1985 clinical evaluation approved by Dr. George Penn, a psychiatrist; and a 1991 psychological evaluation by Dr. Catherine Boyer. Dr. Boyer conducted a general psychological evaluation after the first trial, at the request of Detrich's then-defense attorney, "for the purposes of sentencing, in particular, to determine the extent to which there may be mitigating factors."[3]

This evidence documented Detrich's "very unstable childhood marred with frequent moves and a considerable amount of abuse and neglect." Detrich was born in 1959. He was born with a cleft palate and a cleft lip for which he underwent corrective surgery that left visible scars. Detrich's parents divorced when he was young, and he and his siblings were shuffled back and forth between their parents during a yearslong custody battle. Detrich's father, Norman, effectively kidnapped the children at one point while the children were in the legal custody of their mother. Detrich had a poor relationship with his mother, Patricia, because he thought she did not care about him. Detrich also had a poor relationship with his father, because his father was an absentee parent who failed to intervene to prevent the children's stepmother, Jean, from abusing them; Norman worked long hours and was seldom home.

Detrich's stepmother subjected Detrich and his three siblings to frequent and severe physical and psychological

---

[3] Detrich was represented by James Glanville during his first trial in 1990. Glanville was not involved in Detrich's defense during the second trial.

abuse. In one particularly serious incident, Jean knocked Detrich's brother down a flight of concrete stairs and then threatened to shoot the boy if he reported the abuse to his father. The evidence showed that Jean cruelly punished Detrich for wetting his bed. She once tied Detrich by the neck to a post in the yard and told him that he was no better than a dog. She also held Detrich underwater in a bathtub, and she publicly humiliated Detrich in front of other children on account of his bedwetting.

Detrich began drinking at around age nine, with the encouragement of his stepfather, Kenneth "Skip" Murdie. His stepfather took him to all-night drinking parties and, on one occasion, on a weeklong drinking spree. Detrich had a good relationship with his stepfather, but his stepfather was physically abusive toward Detrich's mother. Detrich began using drugs, including marijuana and speed, at a young age as well. His mother also abused drugs. In 1985, Detrich reported that he had abused most street drugs at one time or another. Detrich's abuse of alcohol led to a host of problems. He totaled his stepfather's truck while drinking and driving as a teenager. He had three drunk driving arrests in his teens and twenties. He spent time in a state hospital's alcohol treatment program in 1986.

Detrich's brother, Danny, died in an automobile accident when Detrich was a young man. Detrich later married his brother's widow, but the marriage ended in divorce. The divorce depressed Detrich, and he attempted suicide. Detrich spent several years in the military before receiving an other-than-honorable discharge.

The sentencing record also contained evidence regarding Detrich's mental health. This evidence suggested that Detrich's cognitive functioning was within the normal

range.  Dr. Penn found no evidence of delusional thinking or a thought disorder and reported that Detrich's "intelligence was clinically estimated to be above average."    Dr. Zimmerman reported that "[r]esults of group psychological tests estimate his intelligence to be in the lower portion of the bright-normal range."   Dr. Boyer noted that Detrich's "[t]hought processes were logical and coherent," that he "appears free of any major mental disorder or other significant psychiatric disturbance," that his "[c]ognitive functioning appeared grossly intact," and that his "stated academic history, spoken vocabulary and performance on written materials suggest at least average intellectual functioning."

The mental health evidence also mentioned Detrich's impulsivity.  Dr. Penn found that Detrich's "judgment was grossly intact with occasional impulsive responses" and noted that Detrich "repeatedly acts in a self-sabotaging and self-destructive way."   Dr. Zimmerman cited Detrich's "considerable poor judgment and poor impulse control," described Detrich as "an impulsive individual with poor judgment and a low tolerance for frustration," and noted that "[w]hen under stress [Detrich] may involve himself in acting-out behavior that is poorly planned."   Dr. Boyer reported that Detrich's score on the component of the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) test associated with impulsivity was not elevated.   But Dr. Boyer diagnosed Detrich with probable antisocial personality disorder, which is associated with impulsivity. *See  Antisocial  Personality  Disorder*,  *American Psychological Association Dictionary of Psychology* (updated  Nov.  15,  2023),  https://perma.cc/KD6A-JM5Y. Dr. Boyer noted that Detrich indicated that "he is someone with a potential for a serious loss of temper, although he does

not believe that this has ever happened. He suggested that, at times, he has frightened others with his anger." Dr. Boyer cited a 1986 incident in which Detrich was charged with holding his wife at knifepoint and threatening to kill her. Those charges were dismissed when Detrich was committed to the state hospital for substance abuse treatment.

The mental health evidence also corroborated Detrich's extensive history of alcohol and drug abuse. Dr. Penn noted that Detrich "has abused alcohol and many street drugs severely in the past," and Dr. Boyer reported that Detrich "has had a lifelong problem with alcohol and drug abuse, the alcohol in particular leading to problems in his life."

Finally, the mental health evidence suggested a connection between Detrich's abusive childhood and his antisocial behavior as an adult. Dr. Penn noted that Detrich had been "reared in an unstable environment where child abuse and neglect as well as apparent poor nurturance were commonplace," that Detrich suffered from "chronically low self-esteem," and that Detrich "repeatedly acts in a self-sabotaging and self-destructive way to insure that he remains unsuccessful and incompetent, as if to fulfill his own perception of low self-worth." Dr. Zimmerman wrote that Detrich "possesses much anger towards parental figures which he has not resolved. Undoubtedly, this has had considerable influence upon his behavior and affected his life-style." Dr. Boyer reported that "Detrich's ability to relate to others appears to have been adversely affected by his developmental experiences." She opined that Detrich's "early childhood experiences, physical abuse at the hands of his stepmother and apathy from his mother" likely "had a significant effect on his ability to trust in relationships with women." Dr. Boyer raised the possibility that Souter's murder "represented the eruption of angry, violent feelings

toward significant women in his past who have hurt him, which were displaced onto the victim." It was also "likely that his long-term substance abuse has functioned as a means of coping with memories or feelings related to his childhood experiences."

At the sentencing hearing, the trial court found beyond a reasonable doubt that Detrich "intended to kill the victim and in fact, alone, killed the victim," satisfying *Enmund* and *Tison*. The trial court also found beyond a reasonable doubt that Detrich killed Souter in an especially cruel manner and that the offense was committed in an especially heinous and depraved manner, satisfying both prongs of the (F)(6) aggravator. The trial court found five mitigating circumstances: (1) that Detrich's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired by alcohol or drugs but not so impaired as to constitute a defense to prosecution, Ariz. Rev. Stat. § 13-703(G)(1) (1994) (now codified at Ariz. Rev. Stat. § 13-751(G)(1)); (2) that Detrich comes from an abusive background, including both physical and mental abuse; (3) that Detrich felt some remorse for the killing; (4) that Detrich did not have prior convictions involving violence; and (5) that Detrich had a long history of alcohol and substance abuse. The trial court sentenced Detrich to death for first-degree murder and to twenty-one years in prison for kidnapping.

On direct appeal, the Arizona Supreme Court upheld Detrich's convictions and sentences, including the trial court's findings on the (F)(6) aggravator. *Detrich II*, 932 P.2d at 1338–39.[4] To establish cruelty, the prosecution was

---

[4] The Arizona Supreme Court "independently review[ed] the aggravating and mitigating circumstances to ensure that the trial court

required to prove beyond a reasonable doubt that Souter "consciously suffered physical pain or mental distress." *Id.* at 1338. The Arizona Supreme Court found "overwhelming evidence that the victim was conscious throughout much of the crime" in light of Souter's defensive-type wounds and Charlton's testimony that Souter attempted to speak, but was able only to gurgle, in response to Detrich's questioning. *Id.* at 1338–39. The Arizona Supreme Court further found that Souter experienced physical pain because she suffered forty cutting and stab wounds, including "a deep cutting wound that stretched across the victim's neck from ear to ear, cutting through the voice box, the esophagus, and into the cerebral column," as well as numerous bruises. *Id.* at 1339. The Arizona Supreme Court also found that Souter suffered mental distress because she experienced uncertainty as to her fate when Detrich held a knife to her neck, told her that he was going to kill her, and dragged her to the car. *Id.*

Separately, the Arizona Supreme Court found that the murder was committed in an especially heinous or depraved manner. *Id.* First, offering Charlton a "shot" at Souter's "dead but warm" body "showed an abhorrent lack of regard for human life" and established that Detrich "relished the murder." *Id.* Second, the sheer number of wounds established that Detrich "engaged in gratuitous violence beyond that necessary to cause death." *Id.* Third, "the victim was helpless," and fourth, "the murder was senseless." *Id.* The Arizona Supreme Court concluded that the aggravating factor outweighed the mitigating factors and affirmed the death sentence. *Id.* at 1340. The United States

---

properly imposed the death penalty." *Detrich II*, 932 P.2d at 1338. The court therefore independently found that the murder was especially cruel and especially heinous or depraved. *Id.* at 1338–39.

Supreme Court denied certiorari. *Detrich v. Arizona*, 522 U.S. 879 (1997).

## B. State Postconviction Review Proceedings

Detrich filed his first petition for state postconviction relief in the trial court in 1999. He was represented by postconviction review counsel, and his petition alleged claims of ineffective assistance of counsel with respect to both the guilt and the sentencing phases of the trial. As to the guilt phase, the petition alleged in relevant part that trial counsel was ineffective for failing to retain forensic experts to address the physical evidence in the case, including the seat covers from Charlton's car, the pattern of blood on Detrich and Charlton, bloodstained jeans found in the back of the car, and Souter's wounds, and for failing to secure Shell's appearance at the second trial. Regarding the sentencing phase, the petition alleged that trial counsel was ineffective for failing to develop and present mitigation evidence and for failing to rebut the (F)(6) aggravator.

Detrich relied on declarations from his sister, mother, and stepfather to argue that trial counsel should have discovered and presented additional mitigation evidence pertaining to his childhood—evidence that Detrich underwent three surgeries to correct his cleft palate and lip; that he stopped breathing and required emergency surgery following the third of those surgeries; that his parents subjected the children to a bitter custody battle following the couple's divorce; that Detrich's father essentially kidnapped the children while Detrich's mother had legal custody of them; that he was severely and frequently physically abused by his stepmother; that his stepmother publicly humiliated him for wetting the bed; that his father was often away from home; that his brother encouraged him to get into fistfights;

that his stepfather encouraged him to consume alcohol at a young age; that he started using marijuana at a young age; and that he was involved in several motorcycle and automobile accidents as a youth, including one involving a vehicle rollover.

Detrich also relied on a report prepared by Dr. Robert Briggs, a neuropsychologist, to argue that trial counsel should have retained a mental health expert to present additional mitigation evidence regarding Detrich's mental health. Dr. Briggs tested and assessed Detrich's neuropsychological functioning in 2000. Dr. Briggs reported that Detrich:

> earned a Halstead Impairment Index of 0.3. This indicates that 30% (two out of seven) of the component tests were within the brain-damaged range. A value of this magnitude represents performance in the normal range of neuropsychological function. On the General Neuropsychological Deficit Scale, the patient earned a score of 25. This score indicates an overall clinical level within the normal range (0–26). Mr. Detrich displayed a relatively consistent pattern of neuropsychological results in which he had good and intact functions with a few impaired performances.

Dr. Briggs concluded that Detrich's brain was biologically intact. He wrote that Detrich's neuropsychological functioning was "in the normal range" while noting that this was "a recovered picture": "As would be expected in a history of reported head injuries and drug use, improvement

in function occurs as time (and sobriety) from the incidents increase."

Dr. Briggs suggested that Detrich's impulsive and antisocial behavior as an adult was related to his abusive childhood:

> This client's match with profile Type D of the Megargee typology suggests that he is an impulsive and nonreflective person who may have a history of serious legal offenses. His problems have probably resulted from a hedonistic, amoral lifestyle and an inability to delay gratification. He is likely (and has been noted) to have come from a chaotic, tense, and noncohesive home where inconsistent discipline was a hallmark. He may have (and did have) had significant interpersonal difficulties in the past. Anger and violence may (and have) resulted when he is provoked. His basic problem seems to be that he is impulsive and insists on having his own way regardless of the law or the feelings of other people.
>
> . . . There[] is little doubt that Mr. Detrich is exhibiting antisocial characteristics. Given the history, it is believed that decision-making, especially when compromised by alcohol, was not based on any consequence-driven thought process, but rather a learned behavior that bypassed right or wrong. When subjected to the abuse noted by Mr. Detrich and collateral sources, it is believe[d] that the

> mindset was developed in which instinct took
> over and reason could not be accessed.

Dr. Briggs also noted that an individual with Detrich's profile "is usually viewed as having a severe Personality Disorder, such as an Antisocial or Paranoid Personality."

Detrich relied on a declaration from Michael Sweedo, a criminalist, to argue that trial counsel should have retained a forensic expert to challenge Charlton's testimony that Souter's gurgling reflected a conscious attempt to speak. As noted, the state courts relied in part on Charlton's testimony about Souter's gurgling to find that Souter was conscious during the attack, which in turn supported the courts' finding that Detrich committed the murder in an especially cruel manner. *Detrich II*, 932 P.2d at 1338–39. Sweedo challenged the proposition that Souter's gurgling represented a conscious attempt to speak:

> I believe that the assistance of a physician
> properly trained in forensic pathology would
> be necessary to make a final analysis; but
> there is cause to believe that after the victim
> in this case was slit from ear to ear, the wound
> penetrating all the way back to her neck bone,
> there is very little probability that the victim
> would have been engaging in conversation of
> any nature, and the possibility of any
> prolonged consciousness, after the removal
> of the oxygen supply to the brain of the
> victim would not be likely.

The petition argued that this testimony was relevant not only to the cruelty prong but also to the heinous or depraved

prong. Because the testimony would have undermined
Charlton's credibility, it would have cast doubt on
Charlton's testimony that Detrich offered Charlton a "shot"
at Souter's "dead but warm" body. That testimony formed
the basis of the state courts' finding that Detrich relished the
murder, which was one of four grounds for deeming the
crime heinous or depraved. *Id*.

Detrich's petition also purported to raise several pro se
claims, including a claim that trial counsel was ineffective
for failing to adequately impeach and cross-examine
Charlton and a claim that trial counsel was ineffective for
offering "an irrational and unsubstantiated argument . . . that
defendant was misidentified."

The trial court denied Detrich's petition for
postconviction relief. With respect to the mitigation claim,
the court ruled:

> Petitioner has not presented a colorable claim
> that trial counsel was ineffective at the
> sentencing stage of the proceedings for
> failing to have Dr. Briggs, a
> neuropsychologist, testify on Petitioner's
> behalf, or to present additional evidence of
> Petitioner's abusive background. After
> considering the initial psychological report,
> the presentence report, a sentencing
> memorandum, and written statements from
> Petitioner's sister citing multiple examples of
> both physical and mental abuse suffered by
> Petitioner as a child, this Court found
> statutory and non-statutory mitigating
> circumstances. Dr. Briggs' report was not
> significantly different from the report

considered by this Court.  Indeed, Dr. Briggs found that Petitioner's general neuropsychological functioning was normal and showed an absence of cognitive dysfunction.  Therefore, there is no reasonable probability that this testimony would have compelled this Court to impose a sentence less than death.  Moreover, additional evidence of Petitioner's dysfunctional childhood would have been merely cumulative and was not "newly discovered."  This claim is summarily dismissed.

The trial court also rejected Detrich's contention that he was prejudiced, at either the guilt phase or the sentencing phase, by trial counsel's failure to retain a forensic expert to address Souter's gurgling:

Petitioner failed to present a colorable claim that his trial counsel was ineffective in failing to retain an expert to rebut the State pathologist's testimony that the victim could have made "gurgling" sounds in response to questioning by Petitioner, after sustaining knife wounds to her throat.  Contrary to [the Sweedo] affidavit submitted by Petitioner, there was no testimony that the victim "engaged in conversation" or was conscious for a long period of time.  The victim sustained four serious wounds to the neck, and it is merely speculative to assume that the victim's attempt to respond occurred after the most serious wound.  No prejudice accrued to

> Petitioner, in any event, because evidence other than Charlton's testimony regarding the "gurgling" sounds independently supported a finding of cruelty at sentencing. Petitioner's claim that expert rebuttal testimony would have discredited Charlton's credibility is unavailing, where overwhelming evidence apart from Charlton's testimony supported the finding that Petitioner committed the murder. This claim is summarily dismissed.

Finally, the trial court rejected Detrich's pro se claims, ruling that Detrich was "not entitled to raise his own claims of ineffective assistance of counsel because he is currently represented by counsel" and that, even if Detrich were permitted to raise pro se claims, "given the lack of evidence, argument, and citation to authority, the claims that Petitioner has attempted to raise are not sufficiently presented to this Court in this proceeding and are, therefore, summarily dismissed." The Arizona Supreme Court denied Detrich's petition for review without opinion.

Detrich filed a second petition for state postconviction relief in 2005. The trial court summarily dismissed that petition under Rule 32.2(b) of the Arizona Rules of Criminal Procedure, which requires a defendant who raises a claim in a successive petition to "explain the reasons for not raising the claim in a previous notice or petition." Ariz. R. Crim. P. 32.2(b). In the alternative, the trial court found that the petition was "frivolous and an abuse of the state post-conviction process." The Arizona Supreme Court once again denied review without opinion.

## C.  Federal Habeas Proceedings

Detrich commenced habeas proceedings in federal district court in 2003, after the Arizona Supreme Court denied relief on his first petition for state postconviction relief.  His amended petition, filed in 2004, raises three claims relevant here: that he received ineffective assistance of counsel at the guilt phase of his second trial (Claim A), and at the sentencing phase of the second trial (Claim B), and that the Arizona courts failed to properly weigh and give effect to mitigation evidence at sentencing (Claim D).

With respect to the guilt phase of the trial (Claim A), the amended petition alleged several discrete acts or omissions by counsel at issue in this appeal.  First, the amended petition alleged that trial counsel was ineffective for failing to discover and present additional evidence of Charlton's racist and violent background, including Charlton's alleged ties to the Aryan Brotherhood, and his violent propensities.  Second, the amended petition alleged that trial counsel was ineffective for failing to secure Shell's live testimony at the second trial.  It alleged that "[c]ounsel's failure to secure the courtroom presence of Shell, the single-most critical witness on Mr. Detrich's behalf, left Mr. Detrich without any effective defense."  Third, the amended petition alleged that trial counsel was ineffective for presenting a misidentification defense that was both meritless and inconsistent with his viable mere-presence defense.  Detrich alleged that he would not have been found guilty of first-degree murder if trial counsel had instead presented a "consistent defense theory of mere presence."  Fourth, the amended petition alleged that trial counsel was ineffective for failing to obtain Carbonell's arrest records and for failing to cross-examine Carbonell on a "glaring inconsistency" between Carbonell's trial testimony and a statement that

Carbonell had given to a defense investigator in 1990: "Mr. Carbonell . . . first said that he 'surmised' who killed Ms. Souter from what Charlton told him, but at trial claimed that Mr. Detrich confessed that he killed Ms. Souter." Fifth, the amended petition alleged that trial counsel was ineffective for failing to "request a single expert to rebut the state's evidence." Detrich alleged that trial counsel should have requested independent testing of hairs found in Souter's hand, fingernail clippings taken from Souter, a knife found at the scene of the crime, the bloody needle found at Souter's house, the seat covers from Charlton's car, and the jeans found in the back of Charlton's car. He also alleged that trial counsel should have requested the assistance of a forensic pathologist to challenge Charlton's testimony that Souter's gurgling sounds reflected a conscious attempt to speak. Detrich argued that this evidence would have been relevant to both the guilty verdict (because it would have undermined Charlton's credibility) and the death sentence (because it would have disputed the consciousness finding underpinning the state courts' finding that the murder was committed in an especially cruel manner).

With respect to the sentencing phase of the trial (Claim B), the amended petition alleged that trial counsel was ineffective for failing to develop and present mitigation evidence and for failing to rebut prosecution evidence supporting the (F)(6) aggravator. The petition faulted trial counsel for failing to develop and present additional mitigation evidence pertaining to Detrich's "social history, traumatic childhood and abuse, family background, and mental impairments." In addition, the petition faulted counsel for failing to retain a neuropsychologist or other expert whose testimony might have undermined the prosecution's evidence that Detrich committed the murder in

an especially heinous or depraved manner. The petition noted that Dr. Briggs's report "provided some evidence of Mr. Detrich's brain damage, impulsivity, childhood abuse, and susceptibility to alcohol addiction," and it argued that "[o]bjective scientific evidence that a brain dysfunction not only existed but arose from a mitigated cause (childhood abuse) would likely have undermined and rebutted the findings of heinousness and depravity, thus eliminating two-thirds of the sole aggravator."

In Claim D, the amended petition alleged that the Arizona courts refused to properly weigh and give effect to mitigation evidence, in violation of his Eighth Amendment rights under *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

In 2005, the district court ruled that several of Detrich's claims were procedurally defaulted because Detrich failed to fairly present them in the petition for review he filed in the Arizona Supreme Court in connection with his first petition for state postconviction relief and state law would preclude him from presenting the claims in a subsequent state petition. The defaulted claims included Detrich's claims that trial counsel was ineffective for presenting a misidentification defense (labeled Claim A(1) by the district court); that trial counsel was ineffective for failing to secure Shell's live testimony (labeled Claim A(3) by the district court); that trial counsel was ineffective for failing to investigate and cross-examine Charlton and Carbonell (labeled Claim A(4) by the district court); and that the Arizona courts refused to give effect to mitigation evidence at sentencing (Claim D). The district court dismissed those claims as procedurally barred.

In 2006, the district court dismissed the portion of Claim B faulting trial counsel for failing to challenge the

prosecution's aggravation evidence. First, the district court held that the state court reasonably applied *Strickland* when it rejected Detrich's claim that trial counsel was ineffective for failing to retain a forensic expert to testify about Souter's gurgling:

> The finding that [Souter] attempted to speak after having her throat slit is only a partial basis for the cruelty finding, and the prong is sufficiently supported without it. Petitioner does not allege he can develop forensic evidence that would fully rebut the finding that the victim was conscious for much of the crime and suffered pain and mental distress, even if there were additional evidence about when the victim lost consciousness. The cruelty finding is sufficiently supported by the eyewitness testimony that the victim was taken to the car at knife point while Petitioner threatened her life, and evidence that she suffered over forty stab wounds, including defensive wounds, as well as blunt force injuries.

Second, the district court concluded that evidence regarding Detrich's brain function or impulsivity would not have affected the sentence because the state courts' findings that Detrich relished the murder, that the murder involved gratuitous violence, that the victim was helpless, and that the murder was senseless were "sufficiently supported by the record to uphold the heinous/depraved finding."**[5]** The

---

[5] The district court also observed that "a defendant's brain function or mental health are not assessed in applying the [heinous/depraved] prong"

district court dismissed the aggravation portion of Claim B with prejudice and without granting a certificate of appealability.

In 2007, following a four-day evidentiary hearing, the district court denied relief on the portion of Claim B contending that trial counsel was ineffective for failing to develop and present additional mitigation evidence at sentencing. *See Detrich v. Schriro*, No. CV-03-229, 2007 WL 4024551 (D. Ariz. Nov. 15, 2007). The district court concluded that trial counsel had performed deficiently but that the Arizona Supreme Court reasonably applied *Strickland* when it concluded that Detrich was not prejudiced. *See id.* at *3–24; 28 U.S.C. § 2254(d)(1).[6] The

---

because the defendant's culpable state of mind is determined based on the defendant's words and actions, rather than on evidence of the defendant's subjective mental state. That observation is in tension with our statement in *Summerlin v. Schriro*, 427 F.3d 623, 641–42 (9th Cir. 2005) (en banc), that "psychiatric evidence of [the petitioner's] lack of impulse and emotional control and organic brain dysfunction" was relevant to whether the crime was committed in an especially heinous matter. The Arizona Supreme Court has held that the defendant's heinous or depraved state of mind "is generally assessed by reference to the defendant's words or actions." *Robinson*, 509 P.3d at 1038. But *Summerlin* assumed that mental health evidence may also be relevant. The district court thus appears to have understated the relevance of the mental health evidence, although this misapprehension does not undermine the court's ultimate conclusion.

[6] In addressing whether the state court reasonably applied *Strickland* under § 2254(d)(1), the district court considered not only the evidence in the state-court record but also the evidence presented for the first time in federal court. *Detrich*, 2007 WL 4024551, at *3. The Supreme Court subsequently clarified that "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011). In reviewing the district court's § 2254(d)(1) analysis de

district court granted a certificate of appealability on the portion of Claim B challenging trial counsel's failure to develop and present additional mitigation evidence. *Detrich*, 2007 WL 4024551, at \*35; *see* 28 U.S.C. § 2253(c). Detrich timely appealed.

On appeal, a three-judge panel granted a certificate of appealability on the portion of Claim B contending that trial counsel was ineffective for failing to challenge the (F)(6) aggravator.   In 2010, the three-judge panel unanimously reversed the denial of habeas relief on Claim B.  *Detrich v. Ryan* (*Detrich III*), 619 F.3d 1038 (9th Cir. 2010).  After the Supreme Court vacated that decision and remanded for reconsideration in light of *Pinholster*, *Ryan v. Detrich*, 563 U.S. 984 (2011), the three-judge panel issued a new decision granting habeas relief on Claim B.  *Detrich v. Ryan* (*Detrich IV*), 677 F.3d 958 (9th Cir. 2012).  One member of the panel dissented.  *Id.* at 992–1000 (McKeown, J., dissenting).

Meanwhile, the Supreme Court issued a decision in *Martinez v. Ryan*, 566 U.S. 1 (2012), holding that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 9.  In light of *Martinez*, Detrich asked this court to remand his procedurally defaulted guilt-phase ineffective assistance of counsel claims to the district court to determine whether his default of those claims could be excused.  While Detrich's *Martinez* remand motion was pending, we voted to rehear the case en banc.  *Detrich v. Ryan*, 696 F.3d 1265 (9th Cir. 2012).   In 2013, we granted Detrich's motion and remanded for the district court to address his *Martinez*

---

novo in Part IV.A, we apply *Pinholster* and do not consider the new evidence that Detrich presented in federal court.

arguments and to adjudicate any guilt-phase ineffective assistance of counsel claims for which Detrich's procedural default was excused under *Martinez*. *Detrich V*, 740 F.3d at 1259 (plurality opinion); *id.* at 1260 (Nguyen, J., concurring in the result); *id.* at 1262 (Watford, J., concurring in the judgment). Five members of the panel dissented. *Id.* at 1262–78 (Graber, J., dissenting). The dissenting judges would have rejected Detrich's *Martinez* arguments without remanding and would have affirmed the district court's denial of habeas relief on Claim B under § 2254(d). In 2017, we expanded the scope of the remand to include the effect of *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc), on Detrich's claim that the Arizona courts applied an unconstitutional causal nexus test at sentencing (Claim D).

The district court resolved the limited remand in 2022. The district court concluded that Detrich failed to demonstrate cause under *Martinez* to excuse the procedural default of the remanded claims and that *McKinney* did not undermine the court's previous rejection of Detrich's causal nexus claim. The district court also granted a certificate of appealability on Claim A. After Detrich timely appealed, the parties filed new appellate briefs. We held oral argument in January 2026, and we now affirm.

## II. Legal Principles

### A. Standard of Review

"This court reviews a district court's denial of a writ of habeas corpus de novo." *Mancebo v. Adams*, 435 F.3d 977, 978 (9th Cir. 2006).

### B. Ineffective Assistance of Counsel

A Sixth Amendment claim of ineffective assistance of counsel requires a showing of both deficient performance

and prejudice. *Strickland*, 466 U.S. at 687. To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness" under "prevailing professional norms." *Id.* at 688. To establish prejudice, the petitioner normally "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.[7] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "When a defendant challenges a death sentence . . . , the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

## C.  Exhaustion and Procedural Default

"A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures." *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022); *see* 28 U.S.C. § 2254(b)(1). "Exhaustion requires that a petitioner 'fairly present[ ]' his federal claims to the highest state court available." *Davis v. Silva*, 511 F.3d 1005, 1008 (9th Cir. 2008) (alteration in original) (quoting *Weaver v. Thompson*, 197 F.3d 359, 365 (9th Cir. 1999)). "A petitioner fairly and fully presents a claim to the state court for purposes of

---

[7] "[P]rejudice is presumed when counsel is burdened by an actual conflict of interest." *Strickland*, 466 U.S. at 692. But "[c]onflict of interest claims aside, . . . ineffectiveness claims . . . are subject to a general requirement that the defendant affirmatively prove prejudice." *Id.* at 693.

satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005) (citations omitted). "A petitioner must alert the state courts to the fact that he is asserting a federal claim in order to fairly and fully present the legal basis of the claim." *Id.* "A claim has not been fairly presented in state court if new factual allegations either 'fundamentally alter the legal claim already considered by the state courts' or 'place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it.'" *Dickens v. Ryan*, 740 F.3d 1302, 1318 (9th Cir. 2014) (en banc) (citations omitted) (first quoting *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986), and then quoting *Aiken v. Spalding*, 841 F.2d 881, 883 (9th Cir. 1988)), *abrogated on other grounds by Shinn*, 596 U.S. at 389.

When a petitioner has failed to present a claim to the state court in accordance with state procedures, and the state court would dismiss the claim on that basis, the claim is technically exhausted but "procedurally defaulted." *Shinn*, 596 U.S. at 371. "To overcome procedural default, the prisoner must demonstrate 'cause' to excuse the procedural defect and 'actual prejudice' if the federal court were to decline to hear his claim." *Id.* (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Under *Martinez*, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9.

To demonstrate cause under *Martinez*, a petitioner must show that "appointed counsel in the initial-review collateral

proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland*." *Michaels v. Davis*, 51 F.4th 904, 934 (9th Cir. 2022) (quoting *Martinez*, 566 U.S. at 14). The petitioner, in other words, must show that postconviction counsel performed deficiently and that the petitioner was prejudiced as a result—i.e., that there is a reasonable probability that, but for postconviction review counsel's errors, the result of the postconviction review proceeding would have been different. "The question is not whether the *particular* [state postconviction review] court would have rendered a more favorable decision, but whether some reasonable [postconviction review] court might have done so." *Id.* at 935.

"To establish 'prejudice' under *Martinez*, the underlying trial counsel [ineffective assistance of counsel] claim must also be 'a substantial one, which is to say . . . that the claim has some merit.'" *Id.* at 931 (quoting *Martinez*, 566 U.S. at 14).[8]

Although *Martinez*'s cause and prejudice requirements are distinct, there is "considerable overlap between these requirements" when, as in this case, "each considers the strength and validity of the underlying ineffective assistance claim." *Djerf v. Ryan*, 931 F.3d 870, 880 (9th Cir. 2019). In a typical *Martinez* analysis:

> The reasonable probability that the result of the post-conviction proceedings would have been different, absent deficient performance

---

[8] In her concurring opinion, Judge Nguyen takes issue with our case law holding that *Martinez*'s prejudice prong requires a showing that the underlying claim is substantial. Because the parties have not raised that issue, we do not address it.

> by post-conviction counsel, is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective. The prejudice at issue is prejudice at the post-conviction relief level, but if the claim of ineffective assistance of trial counsel is implausible, then there could not be a reasonable probability that the result of post-conviction proceedings would have been different.

*Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), o*verruled on other grounds by McKinney*, 813 F.3d at 819.

When assessing cause and prejudice under *Martinez*, a federal habeas court may not consider evidence beyond the state-court record unless the petitioner satisfies the requirements of § 2254(e)(2). *See Shinn*, 596 U.S. at 389 ("[I]f [§ 2254(e)(2)] applies and the prisoner cannot satisfy its 'stringent requirements,' a federal court may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and prejudice under *Martinez*." (citation omitted) (quoting *Williams v. Taylor*, 529 U.S. 420, 433 (2000))).[9]

---

[9] Section 2254(e)(2) states:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—

Here, on remand, Detrich presented the district court with new evidence in support of his *Martinez* motion. The district court expanded the record to include those exhibits without addressing § 2254(e)(2) and without objection from the State.[10] The Supreme Court then decided *Shinn*, holding that § 2254(e)(2) applies to the assessment of cause and prejudice under *Martinez*. 596 U.S. at 389. Shortly after *Shinn* was decided, the district court denied Detrich's

---

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

[10] Although § 2254(e)(2) arguments are subject to forfeiture, *Shinn*, 596 U.S. at 395 n.1, we do not fault the State for failing to raise this objection before *Shinn* was decided. Our pre-*Shinn* case law had deemed § 2254(e)(2) inapplicable to the assessment of cause and prejudice under *Martinez*, *Dickens*, 740 F.3d at 1321, and the State raised the § 2254(e)(2) issue shortly after *Shinn* was decided. *Cf. Wood v. Milyard*, 566 U.S. 463, 470–72 (2012) (authorizing federal habeas courts to consider procedural defenses that the state did not affirmatively waive or strategically withhold when the petitioner has a fair opportunity to present his position); *United States v. Aguilera-Rios*, 769 F.3d 626, 630–31 (9th Cir. 2014) (holding that good cause existed to grant relief from waiver under Rule 12(e) of the Federal Rules of Criminal Procedure where the argument in question had been foreclosed by precedent, the party raised the argument promptly after that precedent was set aside, and the opposing party had a full opportunity to address the issue).

*Martinez* motion. In doing so, the district court considered the new evidence. The court explained that it would assume for purposes of its analysis that Detrich could satisfy § 2254(e)(2) because: (1) there was a plausible case that Detrich could "satisfy the requirements of § 2254(e)(2)"; (2) "the Court has already considered the new evidence proffered by Detrich to determine whether any of his claims should be excused under *Martinez* and reached a negative conclusion"; and (3) forcing the parties and the court to adjudicate the § 2254(e)(2) issue would unnecessarily protract the proceedings. We proceed under the same assumption on appeal. Even taking the new evidence into account, Detrich fails to establish cause under *Martinez*. Remanding this case to adjudicate the § 2254(e)(2) issue would needlessly prolong these already protracted federal habeas proceedings.

When a petitioner argues that evidence presented for the first time in federal court fundamentally alters the claim presented in state court, such that the new claim presented in federal court is procedurally defaulted and subject to *Martinez*, we have held that the federal habeas court has discretion to consider new evidence—without addressing § 2254(e)(2)—for the limited purpose of determining whether that evidence in fact fundamentally alters the claim. *See Atkins v. Bean*, 122 F.4th 760, 773 n.9 (9th Cir. 2024) ("We review this newly presented evidence solely for the purpose of evaluating the possible procedural default of Atkins's claim, i.e., whether the claim is fundamentally altered in federal court."). This approach is in some tension with Supreme Court decisions stating that § 2254(e)(2) questions should be addressed at the outset, lest federal habeas proceedings become needlessly prolonged. *See Shoop v. Twyford*, 596 U.S. 811, 820 (2022) ("A court

therefore must, consistent with AEDPA, determine at the outset whether the new evidence sought could be lawfully considered."); *Shinn*, 596 U.S. at 389–90.  But in *Atkins*, as in this case, deciding the "fundamentally altered" question before the § 2254(e)(2) question shortened, rather than lengthened, the proceedings.  *Atkins* therefore does not appear to run afoul of *Shoop* and *Shinn*.  Importantly, *Atkins* is limited to the threshold inquiry of whether the claim presented in federal court fundamentally alters the claim presented in state court.  122 F.4th at 773 n.9.  As *Shinn* makes clear, new evidence not presented in state court cannot be considered on the merits or to assess cause and prejudice under *Martinez* unless the petitioner satisfies § 2254(e)(2).  596 U.S. at 389.  Thus, even if the threshold *Atkins* inquiry is resolved in the petitioner's favor, the fundamentally altered claim cannot succeed unless the stringent requirements of § 2254(e)(2) are satisfied.

## D.  AEDPA Deference Under § 2254(d)

If a claim was adjudicated on the merits in state court, federal habeas relief may not be granted unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent, 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Under § 2254(d)(2), "[w]e may not characterize . . . state-court factual determinations as unreasonable 'merely because we would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (alteration omitted) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). "If 'reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the [state] court's determination.'" *Id.* at 314 (alterations omitted) (quoting *Wood*, 558 U.S. at 301).

These standards "sharply limit[] federal review of habeas claims raised by state prisoners" and

> require federal courts to give the benefit of the doubt to merits decisions issued by the courts of the sovereign States. AEDPA review provides an important but limited safeguard: It protects against extreme malfunctions in the state courts' adjudication of constitutional claims. So in order to obtain federal habeas relief, a state prisoner must show far more than clear error. The habeas claimant must instead establish that the state court blundered so badly that every fairminded jurist would disagree with the decision. Only then is a decision so lacking

> in justification that its error precludes even
> the possibility for fairminded dispute.

*Klein v. Martin*, 146 S. Ct. 589, 596 (2026) (per curiam) (alterations, citations, and internal quotation marks omitted).

Review under § 2254(d)(1) and (d)(2) is limited to the record that was before the state court. *See Pinholster*, 563 U.S. at 184–85 (§ 2254(d)(1)); *Stevens v. Davis*, 25 F.4th 1141, 1160 n.13 (9th Cir. 2022) (§ 2254(d)(2)). When the last state-court decision adjudicating a claim is unreasoned, we "look through" the unexplained decision to the last reasoned state-court decision and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). "But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.* at 125–26. Here, the trial court rejected Detrich's claims that were properly presented to that court in a reasoned decision, and the Arizona Supreme Court denied review without explanation. We therefore presume that the Arizona Supreme Court adopted the trial court's reasoning. *See id.* "A petitioner who satisfies § 2254(d)(1) or (d)(2) is entitled to de novo review of the merits of the claim." *Marks v. Davis*, 106 F.4th 941, 950 (9th Cir. 2024).

### III.  Guilt-Phase Ineffective Assistance (Claim A)

We begin by addressing Detrich's contention that trial counsel provided ineffective assistance during the guilt phase of the trial. We consider whether Detrich procedurally defaulted these claims and, if so, whether the default is excused under *Martinez*. For nondefaulted claims, we consider whether habeas relief is permitted under § 2254(d).

## A. Misidentification Defense (Claim A1)

Detrich argues that trial counsel was ineffective for presenting a misidentification defense that was both implausible and inconsistent with his mere-presence defense. Because Detrich procedurally defaulted this claim by failing to raise it in the first state postconviction review proceedings, federal review is precluded unless Detrich shows cause and prejudice under *Martinez*. To establish cause under *Martinez*, Detrich must show that postconviction review counsel was ineffective for failing to present the claim in state court. *See Michaels*, 51 F.4th at 934. He must show that there is a reasonable probability that the outcome of postconviction review proceedings would have been different if postconviction review counsel had performed competently. *See id.*

Detrich fails to make that showing because his underlying claim that trial counsel was ineffective is without merit. Even if trial counsel was deficient for presenting a misidentification defense, Detrich was not prejudiced. As the district court explained:

> At worst, any conflict in the presentation of both defenses resulted in the jury concluding that Detrich was with Charlton when Souter was murdered, thus disregarding the misidentification defense. Because Detrich asserts counsel should not have presented that defense, he could not have been prejudiced by the jury's disregard of it.

The district court properly concluded that Detrich failed to establish cause to excuse his procedural default of this claim.

Detrich argued for the first time in his supplemental brief on remand that trial counsel was ineffective for failing to raise an impulsivity defense—known as a *Christensen* defense—to prove that Souter's killing was not premeditated. In *State v. Christensen*, 628 P.2d 580, 582–84 (Ariz. 1981), the Arizona Supreme Court held that evidence that a defendant reacts impulsively to stress may be relevant to an element of premeditation. *See State v. Mott*, 931 P.2d 1046, 1053–54 (Ariz. 1997).

The district court concluded that this claim was beyond the scope of the limited remand:

> In his Amended Petition, Detrich did not allege counsel was ineffective for failing to present a *Christensen* defense. Detrich's *Christensen* argument, presented for the first time in his Supplemental Brief, is not merely additional evidence in support of an existing claim. In other words, the *Christensen* allegations fundamentally alter Claim A(1). In fact, a *Christensen* defense would have directly conflicted with the defense Detrich asserted should have been pursued in his Amended Petition—that it was Charlton, and not Detrich, who killed the victim. Because Detrich did not present this *Christensen* claim in his Amended Petition, the claim could not have been among the claims found defaulted by this Court and remanded by the Ninth Circuit for consideration by this Court.

Detrich challenges the district court's conclusion, arguing that his allegations regarding trial counsel's failure

to raise a *Christensen* defense were within the scope of the remand because they merely provided additional evidence of prejudice with respect to his pleaded claim that trial counsel failed to present a coherent defense. He argues, in other words, that the district court erred by characterizing these allegations as a distinct ineffective assistance of counsel claim that he was required to, but failed to, plead.

We agree with the district court that Detrich's *Christensen* allegations amount to a new claim that he was required to plead. The rules governing § 2254 cases state that a federal habeas petition "must . . . specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground." Rule 2(c), Rules Governing Section 2254 Cases. Consistent with this rule, "[a] convicted defendant making a claim of ineffective assistance must *identify the acts or omissions* of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690 (emphasis added). Here, the amended petition alleged that trial counsel erred by presenting a "scattered, inherently inconsistent and nonsensical" theory of defense, putting forth a "misguided" and "implausible" misidentification defense, and failing to conduct "a reasonable investigation that supported a consistent defense theory of mere presence." These allegations do not encompass the fundamentally distinct allegation that trial counsel was ineffective for failing to present an impulsivity defense to negate the element of premeditation.

The issue presented here—whether a claim pleaded in a federal habeas petition encompasses a related but vastly different allegation of deficient performance—resembles the inquiry we conduct when determining whether a claim that was exhausted in state court encompasses a related but much

different claim raised in federal court. Our decisions in those cases support the conclusion that the claim Detrich raised in his amended petition does not encompass his claim that trial counsel should have presented a *Christensen* defense. In *Moormann v. Schriro*, 426 F.3d 1044, 1055–56 (9th Cir. 2005), for instance, we held that the petitioner's claim that trial counsel "was ineffective for failing to investigate and present a viable defense" did not exhaust his claim that trial counsel presented an insanity defense in a deficient manner. Similarly, in *Gulbrandson v. Ryan*, 738 F.3d 976, 992–93 (9th Cir. 2013), we held that the petitioner's claim that trial counsel was ineffective for failing to present an expert's opinion about the petitioner's state of mind at the time of the crime did not exhaust a claim that trial counsel was ineffective for failing to present the same expert's opinion about the petitioner's potential for rehabilitation. Similar reasoning applies here: Detrich's allegations regarding trial counsel's failure to raise a *Christensen* defense materially alter his Sixth Amendment claim such that he was required to plead them. We agree with the district court that this claim was beyond the scope of the remand.[11]

Our conclusion that this claim was beyond the scope of the remand does not necessarily resolve whether the claim is also beyond the scope of this appeal. The scope of this appeal is dictated not only by Detrich's most recent notice of appeal following the limited remand but also by the original

---

[11] *Cf. Xiong v. Felker*, 681 F.3d 1067, 1074–75 (9th Cir. 2012) (holding that a pleaded claim that the trial court deprived the petitioner of his due process rights by informing jurors accused of misconduct that they were not obligated to speak with the defense after trial was distinct from the unpleaded claim that the trial court deprived the petitioner of his due process rights by failing to require that the former jurors be questioned about the misconduct under oath).

notice of appeal that he filed in 2008 and the replacement opening brief that he filed in 2023.

We are persuaded that Detrich's new claim is beyond the scope of this appeal as well. "Habeas claims that are not raised before the district court in the petition are not cognizable on appeal." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994); *see, e.g.*, *Walden v. Shinn*, 990 F.3d 1183, 1197 (9th Cir. 2021) ("Walden forfeited any such challenge by omitting it from his habeas petition."); *Belgarde v. Montana*, 123 F.3d 1210, 1216 (9th Cir. 1997) ("Belgarde did not raise these claims in his original habeas petition to the district court. . . . Therefore, . . . we do not consider them in this appeal."). Because Detrich failed to plead his claim that trial counsel was ineffective for failing to raise an impulsivity defense to premeditation, we do not consider the claim on appeal.[12]

In sum, Detrich failed to establish cause under *Martinez* to excuse the procedural default of his claim that trial counsel was ineffective for presenting a misidentification defense, and Detrich's unpleaded claim that trial counsel was ineffective for failing to present a *Christensen* defense is not before us.

---

[12] The proper way to raise new claims is by amending one's habeas petition. Detrich argues that seeking leave to amend on remand would have been futile because the district court lacked jurisdiction on limited remand to grant such leave. Detrich, however, could have sought leave to amend before he appealed from the district court's final judgment in 2008, or he could have asked us to expand the scope of the remand.

## B.  Failure to Present Shell's Live Testimony (Claim A(3))

### 1.  Procedural Default and the Appendix Rule

Detrich next contends that trial counsel was ineffective for failing to present Shell's live testimony at trial.  The district court concluded that Detrich procedurally defaulted this claim because he neglected to present it to the Arizona Supreme Court in connection with his first petition for state postconviction relief.  The district court concluded, moreover, that *Martinez* is inapplicable because postconviction review counsel presented the claim to the trial court.  Detrich argues that he fairly presented the claim to the Arizona Supreme Court and, therefore, that the claim is not procedurally defaulted.

By way of background, Detrich included this claim in his first petition for state postconviction relief, which he filed in the trial court.  After the trial court denied the petition, Detrich filed a petition for review in the Arizona Supreme Court.  The body of the petition for review did not mention trial counsel's failure to present Shell's live testimony, but Detrich included a copy of the underlying petition for postconviction relief in the appendix to the petition for review.  Relying on our decision in *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009), Detrich argues that the attachment sufficed to fairly present the claim to the Arizona Supreme Court.

Detrich's argument is colorable because some passages in our decisions suggest that including the underlying petition for postconviction relief in the appendix filed with the state supreme court is sufficient, without more, to fairly present the claims discussed in the underlying petition to the state supreme court.  *See Greenway v. Schriro*, 653 F.3d 790,

801–02 (9th Cir. 2011); *Scott*, 567 F.3d at 582–83; *Insyxiengmay*, 403 F.3d at 668–69.  In *Scott*, for example, we stated without qualification that "presentation of an issue in an appendix is sufficient to present the issue in a full and fair manner to the state courts."  567 F.3d at 582.

We are not persuaded, however, that including the underlying petition in the appendix, without more, is sufficient to fairly present a claim to the state's highest court. Including the underlying petition in the appendix at most informs the state supreme court that the petitioner sought relief on the claim *from the trial court*.  It does not inform the state supreme court that the petitioner is asking *the state supreme court* for relief on the claim.  The purpose of the exhaustion requirement is to give the state court a fair opportunity to *address* the federal claim and *correct* a constitutional error.  *See Duncan v. Walker*, 533 U.S. 167, 178–79 (2001) ("The exhaustion requirement of § 2254(b) ensures that the state courts have the opportunity fully to consider federal-law challenges to a state custodial judgment before the lower federal courts may entertain a collateral attack upon that judgment."); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[T]he exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts."); *id.* at 844 ("Comity thus dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief."); *Rose v. Lundy*, 455 U.S. 509, 518–19 (1982) ("A rigorously enforced total exhaustion rule will encourage state prisoners to seek full relief first from the state courts, thus giving those courts the first opportunity to review all claims of constitutional

error."). The state court is not afforded a fair opportunity to address a claim or correct an error when the petitioner fails to *raise* the claim in that court.

In *Insyxiengmay*, *Scott*, and *Greenway*, the petitioner not only included the underlying petition in the appendix but also made clear in his *brief* that he was seeking procedural relief from the court with respect to the claims set out in the underlying petition. In *Insyxiengmay*, the Washington Court of Appeals dismissed the underlying petition as untimely. 403 F.3d at 663. The petitioner appealed that dismissal to the Washington Supreme Court through a motion for discretionary review and attached a copy of the underlying petition to the motion. *Id.* The body of the motion challenged the lower court's timeliness ruling and asked the Washington Supreme Court to allow the claims to proceed, *id.* at 668–69 & n.5, while the attached underlying petition presented the substance of the federal constitutional claims at issue, *id.* at 669. We held that the petitioner fairly presented the claims to the Washington Supreme Court, and rightly so, because the circumstances fairly apprised the Washington Supreme Court that the petitioner was seeking procedural relief from that court with respect to the claims set out in the attached underlying petition.

In *Scott*, the state trial court denied, on procedural grounds, the petitioner's motion to amend his petition for postconviction relief to add new federal claims. 567 F.3d at 578–79. The petitioner filed a petition for review in the Arizona Supreme Court, challenging the trial court's procedural ruling, and included the proposed amended petition setting out the new claims in the appendix to his brief. *Id.* at 579. After the Arizona Supreme Court denied the petition, the petitioner sought habeas relief in federal court. *Id.* We held that the petitioner fairly presented the

claims to the Arizona Supreme Court. *Id.* at 582–83. Again, this was the correct result, because under the circumstances "the Arizona Supreme Court knew exactly which claims Scott sought to present" in the lower court. *Id.* at 583.

Similarly, in *Greenway*, the state trial court denied, on procedural grounds, the petitioner's motion to file an amended petition for postconviction relief. 653 F.3d at 796. The petitioner "petitioned the Arizona Supreme Court to order the trial court to consider the amended petition," *id.*, and included a copy of the underlying proposed amended petition in the appendix to his petition for review, *id.* at 801. We correctly held that the petitioner fairly presented the underlying claim to the Arizona Supreme Court because "[t]he Arizona Supreme Court knew exactly which claim Greenway sought to present" in the lower court. *Id.*

We hold that a claim is fairly presented to the state supreme court when the circumstances as a whole fairly apprise the state supreme court that the petitioner seeks from the supreme court some form of substantive or procedural relief with respect to that claim. Including the underlying petition in the appendix, without more, is insufficient. The petition for review itself must in some way alert the state supreme court that the claim in question is at issue in the state supreme court's own proceedings. *Cf. Baldwin v. Reese*, 541 U.S. 27, 32 (2004) ("We . . . hold that ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."). To the extent that our terse discussion of this issue in *Gallegos v. Ryan*, 820 F.3d 1013, 1026 n.15 (9th Cir.), *amended on reh'g*, 842 F.3d 1123 (9th Cir. 2016), suggests a different rule, it is overruled.

Here, the district court properly concluded that Detrich failed to present to the Arizona Supreme Court his claim that trial counsel was ineffective for failing to secure Shell's live testimony at trial. Detrich included the underlying petition raising this claim in the appendix to his petition for review, but nothing in the body of the petition for review advised the Arizona Supreme Court that Detrich was asking the Arizona Supreme Court for any form of relief with respect to that claim. The petition for review did not mention Shell at all, let alone Detrich's claim that trial counsel was ineffective for failing to produce Shell as a live witness at the second trial. And, in contrast to *Insyxiengmay*, *Scott*, and *Greenway*, the petition for review did not challenge a lower court's procedural ruling governing this claim.**[13]** Detrich's petition for review challenged the trial court's failure to hold an evidentiary hearing with respect to two other claims, but not as to this claim. In these circumstances, the Arizona Supreme Court could not have surmised that Detrich was asking it for relief with respect to the live testimony claim.

## 2. Second Petition for State Postconviction Relief

Detrich alternatively argues that he fairly presented this claim to the Arizona Supreme Court because he included it in his second petition for postconviction relief, which he presented to the Arizona Supreme Court. We disagree. "A petitioner fully and fairly presents a claim to the state courts if he presents the claim (1) to the correct forum; (2) *through the proper vehicle*; and (3) by providing the factual and legal

---

[13] In Detrich's petition for postconviction relief filed in the trial court, he argued that the trial court should hold an evidentiary hearing on the parties' factual dispute as to whether Shell was available to testify at the second trial. Critically, however, Detrich did not present that claim in the petition for review he filed in the Arizona Supreme Court.

basis for the claim." *Scott*, 567 F.3d at 582 (emphasis added) (citations omitted). "Submitting a new claim to the state's highest court in a procedural context in which its merits will not be considered absent special circumstances does not constitute fair presentation." *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994). Here, the trial court summarily dismissed Detrich's second petition under Arizona Rule 32.2(b) because Detrich failed to show that an exception to the state's bar on successive petitions applied and, in the alternative, because the petition was "frivolous and an abuse of the state post-conviction process," and the Arizona Supreme Court denied review without opinion.[14] Detrich cannot rely on the second petition to avoid procedural default.

### 3. Fundamentally Altered Claim

As an additional fallback argument, Detrich contends that his claim that trial counsel was ineffective for failing to secure Shell's live testimony at trial is procedurally defaulted but subject to *Martinez* because the claim he raises

---

[14] Rule 32.2(b) states in relevant part:

> [W]hen a defendant raises a claim that falls under Rule 32.1(b) through (h) in a successive or untimely post-conviction notice, the defendant must explain the reasons for not raising the claim in a previous notice or petition, or for not raising the claim in a timely manner. If the notice does not provide sufficient reasons why the defendant did not raise the claim in a previous notice or petition, or in a timely manner, the court may summarily dismiss the notice. At any time, a court may determine by a preponderance of the evidence that an issue is precluded, even if the State does not raise preclusion.

Ariz. R. Crim. P. 32.2(b).

today is fundamentally altered from the claim he presented to the trial court in his first state postconviction review petition. As discussed earlier, "[a] claim has not been fairly presented in state court if new factual allegations either 'fundamentally alter the legal claim already considered by the state courts,' or 'place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it.'" *Dickens*, 740 F.3d at 1318 (citations omitted) (first quoting *Vasquez*, 474 U.S. at 260, and then quoting *Aiken*, 841 F.2d at 883). If the fundamentally altered claim was not presented to the state courts, then it is procedurally defaulted and potentially subject to *Martinez*. *See id.* at 1318–21.

Detrich argues that this principle applies to his claim that trial counsel was ineffective for failing to secure Shell's live testimony. Detrich asserts that two pieces of evidence, presented for the first time in federal court, fundamentally alter the claim that he presented to the Arizona trial court in his first state postconviction review petition: (1) a declaration in which juror Lonny Ripplinger stated, "I remember testimony being read into the record and thinking that the witness should have been there to testify in person"; and (2) a declaration in which Shell stated that he "didn't get to explain about Mr. Charlton's confession as much as I wanted to when I testified at Mr. Detrich's trial because I was so exhausted, [defense counsel] didn't ask many questions, and the prosecutor was really mean to me."

This evidence does not fundamentally alter the claim that Detrich presented in state court or place the claim in a significantly different and stronger evidentiary posture than it was when the state court considered it. *See id.* at 1318. Ripplinger thought that Shell should have testified in person,

but his barebones declaration does not say that he discounted Shell's testimony because it was read into the record.

Detrich's contention that Shell would have testified more extensively in 1994 than in 1990 is based on Shell's 1990 interview with a defense investigator, but that interview was part of the record considered by the state court. Because it is not new evidence, it does not fundamentally alter the claim. The new evidence—Shell's declaration—fails to identify any additional testimony that Shell would have offered at the second trial had he testified as a live witness. Shell's vague assertion that he "didn't get to explain about Mr. Charlton's confession as much as [he] wanted to" provides no relevant information.

In his declaration, Shell also suggested that he would have been a more effective witness in 1994 than he was in 1990 because he would not have been wearing handcuffs and jail-supplied clothing and would not have been as tired as he was in 1990. These allegations are new, but they are not substantial enough to fundamentally alter the claim considered by the state court or to place the case in a significantly different and stronger evidentiary posture. *See id*. Although Shell would have appeared in civilian clothing had he testified in 1994, the jury would have known that he had been incarcerated because his testimony would have concerned his jailhouse conversations with Charlton.

To conclude, we agree with the district court that Detrich procedurally defaulted his claim that his trial counsel was ineffective for failing to present Shell's in-person testimony at the second trial. Detrich defaulted the claim by failing to present it to the Arizona Supreme Court. And *Martinez* is inapplicable because Detrich presented the claim to the trial court during his first round of state postconviction review

proceedings. *See Martinez*, 566 U.S. at 16 ("The holding in this case does not concern attorney errors in other kinds of proceedings, including *appeals from initial-review collateral proceedings*, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." (emphasis added)). Because the claim is defaulted and not subject to *Martinez*, the district court properly declined to consider it. Detrich's new evidence, moreover, does not fundamentally alter the claim presented to the state court.

Even if the claim were before us, habeas relief would be precluded under § 2254(d)(1) because the state court's rejection of the claim did not involve an unreasonable application of *Strickland*. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011). The state court reasonably concluded that Detrich "failed to demonstrate that admission of the previously-reported trial testimony prejudiced him, given the overwhelming evidence of Petitioner's guilt and the fact that the first jury convicted him, despite its opportunity to hear Schell's [sic] live testimony."

Finally, we note that our statement in *Detrich V* that this claim was not procedurally defaulted was, as the district court observed, not accurate. *See Detrich V*, 740 F.3d at 1254 (plurality opinion); *id.* at 1268 (Graber, J., dissenting); *see also Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018) ("The law of the case doctrine does not preclude a court from reassessing its own legal rulings in the same case."). The claim was presented to the trial court, but not to the Arizona Supreme Court. It was therefore defaulted. *See O'Sullivan*, 526 U.S. at 845 ("Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the

federal courts, we conclude that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").

## C. Failure to Investigate Charlton and Carbonell (Claim A(4))

Detrich argues that trial counsel was ineffective for failing to interview and investigate Charlton and Carbonell. This claim encompasses several subclaims discussed below.

### 1. Charlton's Dead-But-Warm Testimony

Detrich argues that Charlton fabricated Detrich's question—"it is dead but it is warm, you want a shot of it?"—after receiving a favorable plea deal and that trial counsel was ineffective because counsel "neither asked the court to suppress the recently-fabricated statement nor cross-examined Charlton about it." Because Detrich did not raise this claim in his amended petition, we do not consider it on appeal. *See Cacoperdo*, 37 F.3d at 507.

### 2. Charlton's Sixty-Day Release

Charlton's plea agreement allowed him to be released into the custody of his employers, Clarence and Betty Belville, for sixty days between giving his trial testimony against Detrich and beginning his sentence for kidnapping. During the release, the Belvilles left town for several days, leaving Charlton unsupervised, in violation of the terms of the release. When the Belvilles returned unexpectedly, Charlton mistook Clarence for an intruder and threatened him with a machete. Charlton disclosed on direct examination that his plea agreement included the sixty-day release, but trial counsel did not ask Charlton about it on cross-examination, and no evidence regarding the machete

incident or Charlton's violation of the terms of the release was presented. Detrich argues that trial counsel should have made more of the fact that Charlton's plea agreement included this "suspiciously beneficial" release term, that trial counsel should have presented the evidence that Charlton violated the terms of the release to demonstrate his propensity to lie to authorities, and that trial counsel should have presented the evidence of the machete incident to demonstrate Charlton's propensity for violence and tendency to use knives to attack.

Because this claim is unpleaded, it is beyond the scope of this appeal. *See id.*

### 3. Charlton's Racism and Ties to the Aryan Brotherhood

Detrich contends that trial counsel failed to investigate Charlton's racism and alleged ties to the Aryan Brotherhood. As evidence of Charlton's ties to the Aryan Brotherhood, Detrich relies on the 1999 declaration of James Williams, who was the defense investigator during Detrich's second trial. Williams stated that Charlton "was known to be involved with the Aryan Brotherhood" but that trial counsel did not instruct him "to pursue or conduct interviews of witnesses pertaining to the issue." Williams's declaration did not identify the grounds for his belief that Charlton was known to be involved with the Aryan Brotherhood, but Williams said in a 2004 interview that the information came from Charlton's wife, Deborah, and pertained to Charlton's time in custody following Souter's murder. As additional evidence of Charlton's racism, Detrich points to a 2015 declaration from John Hershiser, Charlton's former brother-in-law, stating that Charlton "said racist things about blacks and Mexicans."

We agree with the district court's rejection of this claim. First, there is no evidence that Charlton was involved with the Aryan Brotherhood at the time of the offense.[15] Although Williams reported that Charlton had known ties to the Aryan Brotherhood, the only source he has identified for that information was Charlton's wife, Deborah, who referred to Charlton's possible involvement with the Aryan Brotherhood during Charlton's time in custody *after* Souter's murder. Detrich argues that Charlton's "grim reaper earrings" and possession of a knife inscribed with the initials "FTW" are evidence of Charlton's ties to the Aryan Brotherhood at the time of the offense, but nothing in the record substantiates Detrich's claim that these symbols are associated with the Aryan Brotherhood. Second, with respect to trial counsel's failure to develop additional evidence of Charlton's racism, Hershiser's declaration is cumulative to, and less persuasive than, the evidence of Charlton's racism that was presented by Shell and Deborah Charlton at trial. Detrich thus failed to establish cause under *Martinez* to excuse the procedural default of this claim.

### 4. Charlton's Violent Tendencies and Mental Instability

Detrich contends that trial counsel was ineffective for failing to discover "evidence of Charlton's violent tendencies and mental instability." He relies on an unsigned 2015 declaration in which Maxine Shaffer, Charlton's former girlfriend, stated that Charlton hung ropes in the shape of nooses from the pipes in her basement, and a 2015 email in which Deborah Hatfield, Charlton's ex-wife, stated

---

[15] The timing of Charlton's alleged ties to the Aryan Brotherhood matters because Detrich relies on the premise that members of the Aryan Brotherhood commit racially motivated murders.

that Charlton "could just as well killed that woman if he was drunk or high."

The district court concluded that this claim was not raised in the amended petition and that, even if it had been, Detrich failed to establish cause under *Martinez*. With respect to Shaffer, the district court noted, first, that Shaffer did not sign the declaration and, second, that Shaffer crossed out the line in the declaration stating that she would have testified to the substance of the declaration if she had been asked to testify at Detrich's trial.[16] With respect to Hatfield's email, the district court concluded that "Deborah's unsworn supposition years later that Charlton *could have* murdered Souter does not rebut the presumption that counsel acted reasonably in investigating the case. Nor is it sufficient to establish prejudice."

We again agree with the district court. Even assuming that this claim was pleaded, Detrich failed to show cause under *Martinez* because he was not prejudiced by postconviction counsel's failure to present the claim. Neither Shaffer's unsigned declaration nor Hatfield's unsworn speculation constitutes evidence of Charlton's violent propensities.

Detrich's claim that trial counsel was ineffective for failing to discover evidence of Charlton's mental instability rests on his contention that Charlton intended to commit suicide before his arrest. Because this claim was not pleaded

---

[16] The record includes a note in which Shaffer wrote: "I have read the declaration that has been prepared for me and agree that it is true and correct but I will not sign it because I am afraid of Alan Charlton. If I had been asked to sign a declaration at a time when Alan Charlton was in custody I would have done so."

in the amended petition, it is beyond the scope of this appeal. *See id.*

### 5. Charlton's Reputation for Untruthfulness

Detrich further argues that trial counsel was ineffective for failing to investigate Charlton's reputation for untruthfulness. Detrich relies on Hershiser's statement in a 2015 declaration that Charlton lied about his drug use to get out of the military and the 2015 declaration of Betty Sue Cates, Charlton's former employer, stating that Charlton "was always telling outrageous stories" and "told lies and stories and bragged about things he said he had done" to make himself look good. Because this claim was not pleaded, it is beyond the scope of this appeal. *See id.*

### 6. Inconsistencies in Charlton's Testimony

Detrich contends that Charlton's testimony regarding the timeline on the night of the crime and Detrich's motive for killing Souter is contradicted by other evidence in the case and that trial counsel was ineffective for failing to cross-examine Charlton on these inconsistencies. Again, the claim is beyond the scope of this appeal because it was not pleaded. *See id.*

### 7. Carbonell's Prior Inconsistent Statement

Next, Detrich argues that trial counsel was ineffective for failing to cross-examine Carbonell with a prior inconsistent statement. At trial, Carbonell testified that Detrich confessed to killing Souter. In a 1990 statement to a defense investigator, however, Carbonell suggested that he only "surmised" that Detrich was the killer. Detrich contends that trial counsel was ineffective for failing to cross-examine Carbonell on this inconsistency. The district court concluded that Detrich failed to establish cause under

*Martinez* to excuse the procedural default of this claim. We agree.

By way of background, Carbonell recounted his conversations with Detrich three times. The first time he did so, in 1989, he gave a statement to the police. In that statement, Carbonell was clear that Detrich *confessed* to attacking Souter:

> [Detrich] told me. He got in a hell of a fight and he says I cut somebody's real bad. . . . [H]e did not say . . . who he cut. He just said he got in a fight and he cut somebody. . . . [H]e said I went and got some drugs and the drugs was not good, he says, and, uh, so, he said, I made the woman leave with me by knife point, he says, and I showed her what. What happens when people give bad drugs to me. He say, I cut her.

In 1990, Carbonell spoke to the defense investigator. The transcript of that interview is difficult to follow and appears to be internally contradictory. At one point, Carbonell told the investigator that Detrich confessed to the killing, consistent with his 1989 statement to the police and his 1994 testimony at trial: "[Detrich] told—[Detrich] told me that—that he—he killed a girl and he's going to leave town." But a few questions later, Carbonell suggested that he only *surmised* that Detrich was the killer:

> Q: Did [Detrich] tell you that Charlton had anything to do with it?
>
> A: No. He didn't say that—that—all he said that—that—he was driving the car. That

[Charlton] was driving the car. That he did tell me at the Swap Meet. That he was—that—he di—he didn't—he didn't say that he killed the girl. But, he said [Charlton] was driving the car. So, I guess—I just surmised that—that—

Q: Yeah.

A: —he had—he had been the one that cut the girl. 'Cause [Charlton] told me later on[] that he did cut the girl up. Then, [Charlton]—[Charlton] told me Sunday night when he come up to the house—

Q: Okay.

A: —that he killed the girl.

Next, at trial, Carbonell once again testified that Detrich *confessed* to killing Souter:

Q: Tell the jury what it was [Detrich] told you the second time.

A: [Detrich] told me he killed a girl.

Q: What did he say about it?

A: He said he had gone to some house where there was—went to get some drugs, and some bad drugs, and he grabbed the girl out of the house by knife point and jumped in the car and they left. That is when he killed her.

Q: Did he say how he killed her?

A:  With a knife.

If there were a clear-cut inconsistency between Carbonell's trial testimony and his previous statements, it might be difficult to explain trial counsel's failure to explore the inconsistency on cross-examination.  But that is not the case.  Carbonell's statements to the defense investigator in 1990 were ambiguous, and Carbonell's trial testimony is consistent with his statement to the police shortly after the crimes occurred.  In these circumstances, trial counsel reasonably could have concluded that cross-examining Carbonell on this subject would not have benefited Detrich's defense.  Furthermore, even Carbonell's statement that he "surmised" Detrich was the killer confirms that Charlton was the person driving the car, making Detrich the logical killer. As the district court observed, "[p]ointing out any claimed inconsistencies in Carbonell's statements addressing whether Detrich actually confessed to the murder would have merely placed emphasis on both Charlton's and Detrich's accounts of that night, in which both agreed that Charlton was driving while the victim was murdered."  We agree with the district court that Detrich has not established cause under *Martinez* to excuse the procedural default of this claim.

### 8.  Carbonell's Arrest Records

Detrich also argues that trial counsel was ineffective for failing to cross-examine Carbonell about his arrest records. In the 1990 interview, the defense investigator asked Carbonell whether he had any prior felonies.  Carbonell responded that he did not, but he volunteered that he had "been arrested for—me and my ex-wife got in a couple of fights—you know, but no—no big things."  Detrich contends that Carbonell's statement was untruthful because Carbonell

had been charged, not long before the interview, with assault, failure to appear, leaving the scene of an accident, and driving with a suspended license. The district court rejected this claim, concluding that "[t]here is no reasonable probability that impeaching Carbonell with his incomplete recitation of his arrests four years before his interview in response to a question about his prior convictions would have resulted in a different outcome at sentencing."

We agree with the district court that Detrich has not established cause under *Martinez* to excuse the procedural default of this claim. Because Carbonell's answer to the investigator's question was truthful—the investigator asked about prior felony convictions, not arrests—trial counsel performed reasonably and Detrich was not prejudiced. The district court inaccurately stated that the unmentioned 1990 arrest took place four years before the interview, but the timing of the arrest does not affect our conclusion that Detrich has not established cause under *Martinez*.

### 9. Carbonell's Theft from His Employers

Detrich argues that trial counsel was ineffective for failing to impeach Carbonell concerning his theft from his employers.[17] In a 2015 declaration, Betty Sue Cates stated that Carbonell stole uniforms and tools when he left Cates's employ in late 1989. Detrich argues that trial counsel should have discovered this evidence and used it to impeach Carbonell at trial. Detrich failed to establish cause under *Martinez* to excuse the procedural default of this claim because cross-examination on this point would not have

---

[17] Because the district court appears to have assumed that Detrich pleaded this claim in his amended petition, we do as well. We note, however, that the claim does not appear to have been pleaded.

discredited Carbonell's testimony enough to result in a different outcome at trial.[18] Thus, Detrich has not shown that postconviction review counsel was ineffective for failing to present this claim in state court.

## D. Cumulative *Martinez* Analysis

Detrich fails to establish cause under *Martinez* even when we consider the cumulative effect of postconviction review counsel's alleged deficiencies. *Cf. Silva v. Woodford*, 279 F.3d 825, 834 (9th Cir. 2002) ("[C]umulative prejudice from trial counsel's deficiencies may amount to sufficient grounds for a finding of ineffectiveness of counsel."). The underlying allegations of ineffective assistance of trial counsel lack merit because Detrich was not prejudiced by the alleged deficiencies. Trial counsel's presentation of a misidentification defense, failure to present additional evidence of Detrich's racism and violent propensities, and failure to cross-examine Carbonell on his arrest record had little, if any, effect on the outcome of the trial. Detrich's claims that trial counsel should have cross-examined Carbonell on his prior inconsistent statement and

---

[18] We assume for purposes of our analysis that the defense could have cross-examined Carbonell about the theft. *See* Ariz. R. Evid. 608(b) ("Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness . . . ."); *State v. Lee*, 728 P.2d 298, 299–300 (Ariz. Ct. App. 1986) (holding that the trial court did not err by allowing the prosecution to ask a defense character witness, who had testified about the defendant's reputation for honesty and truthfulness, whether he was aware that the defendant had been fired from a job for stealing and whether that knowledge would change the witness's opinion of defendant's character).

his theft from his employers are more substantial, but even when considered cumulatively, they do not establish a reasonable probability that the outcome of trial would have been different. Because the underlying claims of ineffectiveness fail under *Strickland*'s prejudice prong, Detrich has not established that postconviction counsel performed deficiently by failing to raise these claims or that he was prejudiced by postconviction counsel's failure to do so. Accordingly, even viewing Detrich's claims cumulatively, Detrich has not established cause under *Martinez*.

### E. Failure to Retain a Forensic Pathologist (Claim A(5))

Detrich contends that trial counsel was ineffective for failing to retain a forensic pathologist to (1) challenge Charlton's testimony that he heard Souter gurgling and (2) evaluate physical evidence in the case. At trial, the jury heard only from the prosecution's pathologist, Dr. Henry. Detrich suggests that an independent forensic pathologist would have contradicted aspects of Charlton's and Dr. Henry's testimony, undermining both Charlton's credibility and the evidence that Souter was conscious throughout much of the crime. Detrich contends that this evidence would have affected both the verdict and his sentence.

As a threshold matter, Detrich's claim that trial counsel was ineffective for failing to retain an independent pathologist to rebut physical evidence, other than Charlton's testimony regarding Souter's gurgling, was not presented in the amended petition.[19] This claim is therefore beyond the

---

[19] Detrich contends that a forensic pathologist examining Souter's thigh wound could have contradicted Charlton's testimony that Detrich was

scope of this appeal. *See Cacoperdo*, 37 F.3d at 507. Our review is limited to Detrich's claim that counsel was ineffective for failing to retain a forensic expert to challenge Charlton's testimony about Souter's gurgling.

### 1. Procedural Default

The district court concluded that Detrich procedurally defaulted his claim that trial counsel was ineffective for failing to retain a forensic pathologist to rebut Charlton's testimony that Souter consciously gurgled after her throat was cut. Detrich presented this claim in his first petition for state postconviction relief in the trial court, but the district court concluded that Detrich failed to present the claim in his petition for review filed in the Arizona Supreme Court.

We conclude that Detrich fairly presented this claim to the Arizona Supreme Court. Detrich's petition for review argued that trial counsel was ineffective because he "asked for the appointment of no forensic experts." Although the petition for review did not specifically argue that trial counsel should have retained a forensic expert to challenge this testimony, the petition pointed to Sweedo's declaration as evidence of the expert assistance "reasonably required to investigate this case." Sweedo's declaration, in turn, said that "the assistance of a physician properly trained in forensic pathology would be necessary" to determine whether Souter was capable of consciously attempting to speak after her throat was cut. The petition for review also

---

positioned on top of Souter; that a forensic expert evaluating the cuts on Charlton's left arm could have contradicted Charlton's testimony that he was driving while Souter was attacked; and that a forensic expert examining the scrape marks on Souter's body could have contradicted Charlton's testimony that Souter's body was moved by a single person. Detrich did not raise any of those contentions in his amended petition.

faulted the trial court for failing to hold an evidentiary hearing to address the issues raised in Sweedo's declaration. Finally, the appendix to the petition for review included the underlying petition for postconviction relief that had been filed in the trial court. As noted, that petition set out Detrich's claim that trial counsel was ineffective for failing to retain an expert to rebut Charlton's testimony about Souter's gurgling.

We are persuaded that the Arizona Supreme Court was fairly apprised that Detrich was seeking relief from that court with respect to his claim that trial counsel was ineffective for failing to retain a forensic expert to challenge that testimony. At the very least, the state court was on notice that Detrich was challenging the trial court's failure to appoint an expert and hold an evidentiary hearing on this claim. We thus conclude that Detrich fairly presented this claim to the Arizona Supreme Court.

We reject the State's argument that Detrich has conceded that he did not fairly present this claim to Arizona Supreme Court. In the district court, Detrich conceded only that he failed to exhaust his claims that trial counsel was ineffective "for failing to obtain all forensic evidence in the case and failing to request and/or obtain forensic testing of the evidence." That passage does not encompass his claim that trial counsel was ineffective for failing to retain a forensic pathologist to challenge the specific testimony at issue.

In sum, we hold that this claim is not procedurally defaulted. Because the claim is nondefaulted, we need not and do not consider Detrich's argument that new evidence presented in federal court fundamentally alters the claim.

## 2. AEDPA

Because the Arizona Supreme Court adjudicated this claim on the merits, we may not grant habeas relief unless the state court's decision was contrary to or involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts.   28 U.S.C. § 2254(d).  Because the Arizona Supreme Court's decision is unreasoned, we assume that the Arizona Supreme Court adopted the trial court's reasoning.  *See Wilson*, 584 U.S. at 125.  The trial court rejected this claim, in part, on the ground that Detrich failed to establish prejudice under *Strickland*:

> Petitioner failed to present a colorable claim that his trial counsel was ineffective in failing to retain an expert to rebut the State pathologist's testimony that the victim could have made "gurgling" sounds in response to questioning by Petitioner, after sustaining knife wounds to her throat.  Contrary to [the Sweedo] affidavit submitted by Petitioner, there was no testimony that the victim "engaged in conversation" or was conscious for a long period of time.  The victim sustained four serious wounds to the neck, and it is merely speculative to assume that the victim's attempt to respond occurred after the most serious wound.  No prejudice accrued to Petitioner, in any event, because evidence other than Charlton's testimony regarding the "gurgling" sounds independently supported a finding of cruelty at sentencing.  Petitioner's claim that expert rebuttal testimony would have discredited Charlton's credibility is

unavailing, where overwhelming evidence apart from Charlton's testimony supported the finding that Petitioner committed the murder. This claim is summarily dismissed.

Detrich contends that this decision involved an unreasonable application of *Strickland* and was based on an unreasonable determination of the facts. For the reasons that follow, we disagree. We reiterate that our review under § 2254(d) is limited to the state-court record. We therefore consider the 1999 Sweedo declaration but not the declaration provided by Dr. Terri Haddix, a forensic pathologist, in 2015.

### a.  Section 2254(d)(1)

Detrich argues that the state court applied *Strickland* unreasonably when it concluded that there was no reasonable probability that expert testimony on Souter's gurgling would have resulted in a different outcome during the guilt and sentencing phases of the trial. He argues that expert testimony would have undermined the state courts' finding that Souter was conscious throughout much of the crime, which in turn would have undermined the finding that he committed the murder in an especially cruel manner. Detrich also argues that this testimony would have undermined Charlton's credibility generally, calling into question both the guilty verdict and the state courts' finding that the murder was especially heinous or depraved, which rested in part on Charlton's testimony that Detrich offered him a "shot" at Souter's "dead but warm" body.

We are not persuaded that the state court applied *Strickland* unreasonably in concluding that Detrich was not prejudiced. As to the guilt phase, the state court's conclusion

that "overwhelming evidence apart from Charlton's testimony supported the finding that [Detrich] committed the murder" is, while debatable, not objectively unreasonable. Even without Charlton's testimony, the evidence established that Detrich threatened to kill Souter, forced Souter into the car at knifepoint, arrived at Carbonell's house after the murder "covered with blood," and confessed to Carbonell that he had "killed a girl by slitting her throat." *Detrich II*, 932 P.2d at 1332.

With respect to sentencing, the state courts' finding of Souter's consciousness rested not only on Charlton's testimony about Souter's gurgling but also on Souter's numerous defensive-type wounds. Thus, the state courts would have found that Souter consciously suffered physical pain even without Charlton's testimony about Souter's gurgling. Furthermore, even if Detrich could negate the finding of Souter's consciousness, the state courts would have found that the murder was especially cruel because Souter suffered mental distress when she feared for her life before she lost consciousness. *See id.* at 1339. As to the heinous or depraved prong, even if Detrich had rebutted Charlton's "dead but warm" testimony, thereby undermining the state courts' finding that Detrich relished the murder, the state courts would have found that the murder was especially heinous or depraved because it involved gratuitous violence, Souter was helpless, and the murder was senseless. *See id*. The state court reasonably concluded that there was no reasonable probability that this expert testimony would have resulted in a different outcome at sentencing.

### b. Section 2254(d)(2)

Detrich argues that the state court's decision rejecting this claim was based on an unreasonable determination of

the facts because the trial court declined to hold an evidentiary hearing on the claim. But "a state court's failure to hold an evidentiary hearing is not unreasonable under § 2254(d)(2)" when "'there is no likelihood that an evidentiary hearing would have affected the determination of the state court.'" *Atwood v. Ryan*, 870 F.3d 1033, 1050 (9th Cir. 2017) (quoting *Perez v. Rosario*, 459 F.3d 943, 951 (9th Cir. 2006)); *see also Hibbler v. Benedetti*, 693 F.3d 1140, 1149 (9th Cir. 2012) ("A state court could also have reasonably determined that an evidentiary hearing would be fruitless."). Here, the state court rejected this claim because "evidence other than Charlton's testimony regarding the 'gurgling' sounds independently supported a finding of cruelty at sentencing" and "overwhelming evidence apart from Charlton's testimony supported the finding that [Detrich] committed the murder." An evidentiary hearing on whether Souter's gurgling reflected consciousness would not have affected the state court's reasoning. The lack of an evidentiary hearing therefore did not render the factfinding process unreasonable.

Alternatively, Detrich contends that the state court's decision rejecting this claim was based on an unreasonable determination of the facts because the state court's finding that "overwhelming evidence apart from Charlton's testimony supported the finding that [Detrich] committed the murder" was objectively unreasonable. As discussed earlier, there was strong evidence of Detrich's guilt apart from Charlton's testimony. While the state court's characterization of this evidence as "overwhelming" is debatable, it is not objectively unreasonable.

Detrich faults the state court for failing to identify the specific pieces of evidence underpinning its finding that the evidence of guilt was overwhelming. But "federal courts

have 'no authority to impose mandatory opinion-writing standards on state courts,'" *Klein*, 146 S. Ct. at 596 (quoting *Johnson v. Williams*, 568 U.S. 289, 300 (2013)), and "a state court 'need not make detailed findings addressing all the evidence before it,'" *id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 347 (2003)).  That the state court declined to spell out the evidence of Detrich's guilt does not, without more, establish that its decision was based on an unreasonable determination of the facts under § 2254(d)(2).

In sum, we hold that this claim is nondefaulted but that relief is precluded under § 2254(d).  Because § 2254(d) bars relief, and because we are limited to the record before the state court, the district court properly declined to hold an evidentiary hearing on this claim.

## IV.  Penalty-Phase Ineffective Assistance (Claim B)

Detrich argues that trial counsel's failure to investigate and present mitigation evidence and to investigate and challenge the prosecution's aggravation evidence denied him the effective assistance of counsel at sentencing. Because the Arizona Supreme Court adjudicated this claim on the merits, we may not grant habeas relief unless the state court's decision was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts.    28 U.S.C. § 2254(d).  Because the Arizona Supreme Court's decision is unreasoned, we presume that the Arizona Supreme Court adopted the trial court's reasoning.  *Wilson*, 584 U.S. at 125. We consider only the evidence that was before the state court during Detrich's first state postconviction review proceedings.  *Pinholster*, 563 U.S. at 184–85.  We begin by addressing Detrich's contention that the Arizona Supreme Court's prejudice determination involved an unreasonable

application of *Strickland*.  We then address Detrich's contention that the Arizona Supreme Court's decision was based on an unreasonable determination of the facts.  We assume for purposes of our analysis that *Strickland*'s deficient performance prong is satisfied—i.e., that trial counsel's performance fell below professional standards.

## A.  Section 2254(d)(1)

Detrich argues that the Arizona Supreme Court's conclusion that he was not prejudiced by trial counsel's performance at sentencing involved an unreasonable application of *Strickland*'s prejudice prong.  Detrich asserts that the evidence developed in state postconviction review proceedings showed a reasonable probability that, but for counsel's deficient performance, he would have received a sentence other than death.  Specifically, he relies on: (1) additional mitigation evidence regarding his abusive childhood;  (2) additional mental health evidence; (3) evidence challenging the cruelty prong of the (F)(6) aggravator;  (4) evidence challenging the heinous or depraved prong of the (F)(6) aggravator; and (5) evidence challenging the state courts' *Enmund-Tison* finding.

## 1.  Abusive Childhood

Detrich argues that the evidence of his abusive childhood developed for the first time in state postconviction proceedings would have added significantly to the case for leniency.  He relies on evidence that he had three surgeries to correct his cleft palate and lip, including one surgery that caused serious complications; he got into a lot of fistfights, encouraged by his older brother; he and his siblings were kidnapped by their father following his parents' divorce and custody battle; he and his siblings were severely and frequently beaten by his stepmother, Jean; Jean concealed

the abuse; Jean publicly humiliated him for wetting the bed; Jean pretended to be the children's biological mother; Detrich began abusing alcohol and drugs at a young age; his father was seldom home; and he got into several motor vehicle accidents as a youth, including one involving a vehicle rollover.

This evidence would not have bolstered the case for leniency significantly.  First, as the state court observed, most of this evidence was cumulative.  The record that was before the state courts at sentencing already included evidence that Detrich was born with a cleft palate that required corrective surgery; that Detrich's father kidnapped the children during the couple's custody dispute; that Detrich's father was rarely home; that Jean pretended to be the children's biological mother; that Jean physically abused the children on a daily basis; that Jean physically abused Detrich for wetting the bed; that Jean publicly humiliated Detrich over his bedwetting; that Jean concealed the children's injuries; that Jean once tied Detrich outside like a dog; that Detrich abused alcohol and drugs from a young age; that Detrich's stepfather encouraged him to drink; and that Detrich was involved in several motor vehicle accidents as a youth, including one involving a vehicle rollover. Detrich has not demonstrated that there is a reasonable probability that the presentation of cumulative evidence as to these facts would have resulted in a different outcome at sentencing. *See Thornell v. Jones*, 602 U.S. 154, 170 (2024) ("There is no reasonable chance that [the state] courts would reach a different result on a second look at essentially the same evidence."); *Wong v. Belmontes*, 558 U.S. 15, 22 (2009) (per curiam) ("Some of the evidence was merely cumulative of the humanizing evidence Schick actually

presented; adding it to what was already there would have made little difference.").

To be sure, some of the evidence of childhood abuse presented in the state postconviction proceedings was new. Detrich's mother, Patricia Jane Koch, provided additional details about the surgeries Detrich underwent to correct his cleft palate and cleft lip. The declaration Koch submitted in connection with the state postconviction proceedings stated that Detrich was "severely deformed with a cleft palate and . . . lip when he was born," that Koch "was not allowed to see him for three or four days afterwards," and that she "was not allowed to take him home until he was eleven or twelve days old." Koch stated that Detrich had three surgeries to correct this condition, including one as a newborn, one when he was about eighteen months old, and the third when he was about three. After the third surgery, Detrich "had excessive bleeding down his throat that caused him to stop breathing" and "he was rushed back into surgery to correct the problem." Although the sentencing courts knew that Detrich had been born with a cleft palate that required corrective surgery, they were not aware of these additional details. Koch's statement that Detrich "would get in a lot of fistfights with other children" beginning at the age of five, with the encouragement of his older brother, was also new. But neither the information about Detrich's fistfights nor the additional details about Detrich's corrective surgeries would have added significantly to the evidence concerning Detrich's abusive childhood that was already in the record at sentencing.

## 2. Mental Health Evidence

The sentencing record included three psychological reports, two prepared in 1985 by Drs. Zimmerman and Penn,

and one prepared in 1991 by Dr. Boyer. The 1991 report was produced at the request of Detrich's then-defense counsel, James Glanville, "for the purposes of sentencing, in particular, to determine the extent to which there may be mitigating factors." In 2000, state postconviction review counsel retained Dr. Briggs, a neuropsychologist, "to determine the patient's current intellectual and cognitive abilities and whether there are any neuropsychological deficits contributing to his current situation."

Detrich argues that findings in Dr. Briggs's report would have added significantly to the case for leniency because: (1) "Dr. Briggs found that on 30% of the component tests of the Halstead Impairment Index, [Detrich] scored 'within the brain-damaged range'"; (2) Detrich's "overall neuropsychological functioning was barely within the normal range"; (3) Dr. Briggs "found that [Detrich's] test results were consistent with children raised in violent homes"; and (4) Dr. Briggs "identified [Detrich's] 'decision-making, especially when compromised by alcohol' as being driven by 'instinct,' rather than 'any consequence-driven thought process.'"

We are not persuaded that Dr. Briggs's finding that Detrich scored within the brain-damaged range on two of the seven components of the Halstead Impairment Index would have been mitigating. Notwithstanding Detrich's scores on those component tests, Dr. Briggs found that Detrich's overall score on the Halstead Impairment Index "represents performance in the normal range of neuropsychological function." Dr. Briggs found that Detrich "displayed a relatively consistent pattern of neuropsychological results in which he had good and intact functions with a few impaired performances" and found that, "[b]iologically, Mr. Detrich's brain is intact and he has good abilities when he accesses it."

Dr. Briggs did not find that Detrich suffered from brain damage.

Detrich's contention that his neuropsychological functioning was "barely" within the normal range is based on Dr. Briggs's observation that Detrich scored a 25 on the General Neuropsychological Deficit Scale, indicating "an overall clinical level within the normal range (0–26)." But Dr. Briggs did not state that Detrich's neuropsychological functioning was "barely" normal. He stated three times that Detrich's neuropsychological functioning was in "the normal range," that Detrich's brain was biologically intact, and that Detrich "had good and intact functions with a few impaired performances." These findings are consistent with those of Dr. Boyer, who found that Detrich's "[c]ognitive functioning appeared grossly intact."

Detrich correctly points out that Dr. Briggs found a connection between Detrich's abusive childhood and his adult antisocial behavior. But Detrich does not explain how this information would have added to the case for leniency. Even without this information, the state courts found that Detrich's abusive childhood was a mitigating factor. In addition, the psychological reports in the record at sentencing already drew connections between Detrich's childhood abuse and his adult antisocial behavior. Dr. Zimmerman noted that Detrich's unresolved "anger towards parental figures . . . [u]ndoubtedly . . . had considerable influence upon his behavior." Dr. Boyer found that instability, physical abuse, domestic violence, familial and personal substance abuse, and the absence of structure, supervision, discipline, and guidance led to Detrich's "unconventional and unstable" adult lifestyle, "adversely affected" his "ability to relate to others," had a "significant effect on his ability to trust in relationships with women,"

and led to his use of drugs and alcohol. Dr. Boyer even speculated that Souter's killing might have "represented the eruption of angry, violent feelings toward significant women in his past who have hurt him, which were displaced onto the victim."

Finally, Detrich does not explain why Dr. Briggs's observation that Detrich's decision-making was based on instinct rather than consequence-driven thought would have been afforded mitigating weight.[20]  In any event, Dr. Briggs's observation that Detrich acted on instinct rather than reason was consistent with evidence that already was in the record at sentencing. Dr. Zimmerman cited Detrich's "considerable poor judgment and poor impulse control" and noted that Detrich possesses "considerable underlying anger with which he has difficulty coping." Dr. Zimmerman described Detrich as "an impulsive individual with poor judgment and a low tolerance for frustration" who "may involve himself in acting-out behavior that is poorly planned" when "under stress." Dr. Penn noted that Detrich was "impulsive," became "frustrated quickly," and repeatedly engaged in "self-destructive behavior." Dr. Boyer described Detrich as "someone with a potential for a serious loss of temper" who has, at times, "frightened others with his anger." Detrich told Dr. Boyer that "if drinking and someone makes him angry, he begins to escalate in his anger until he shakes"—behavior that was "often frightening to others."

In sum, the mental health evidence submitted in state postconviction proceedings was not substantially different

---

[20] Detrich's contention that this finding is relevant to aggravation is discussed below.

from, or substantially more mitigating than, the mental health evidence that was in the record at sentencing.

### 3. (F)(6) Cruelty Prong

Detrich argues that the evidence presented in the state postconviction review proceedings shows that the state courts' "especially cruel" finding was rebuttable. The state courts found that Detrich committed the murder in an especially cruel manner because (1) Souter consciously suffered physical pain and (2) Souter suffered mental distress when she feared for her life. *Detrich II*, 932 P.2d at 1338. Detrich argues that competent counsel would have challenged the state courts' finding that Souter was conscious throughout much of the crime, which would have either negated the cruelty finding entirely or at least lessened its weight in the balancing of aggravating and mitigating factors.

Detrich argues that a forensic pathologist would have challenged Dr. Henry's estimates of when Souter's wounds would have caused unconsciousness and death. This argument is unpersuasive because it relies on Dr. Haddix's 2015 declaration, which was not part of the record before the state court during postconviction review proceedings. We may not consider this evidence in assessing whether the Arizona Supreme Court's decision involved an unreasonable application of *Strickland*. *See Pinholster*, 563 U.S. at 184–85. In any event, there was highly probative evidence of Souter's consciousness apart from Dr. Henry's testimony, including the defensive-type injuries on Souter's hands and Charlton's testimony that Souter made gurgling sounds in response to Detrich's questioning. Detrich argues that a forensic expert would have challenged Charlton's testimony that Souter's gurgling reflected a conscious attempt to speak,

but this contention also rests on the Haddix declaration that was not presented to the state courts. The cruelty finding was not plausibly rebuttable.

## 4.  (F)(6) Heinous or Depraved Prong

Detrich argues that the evidence presented in state postconviction proceedings also would have rebutted the state courts' finding that the crime was especially heinous or depraved. Specifically, he contends that this evidence would have rebutted the findings that he relished the murder and engaged in gratuitous violence.

Detrich argues that the relishing finding was rebuttable because it rested on Charlton's unreliable testimony that Detrich offered him a "shot" at Souter's "dead but warm" body after the killing. Detrich contends that Charlton fabricated this testimony after he received a favorable plea agreement from the prosecution and that competent counsel would have either moved to suppress the statement or cross-examined Charlton about it. As discussed earlier, Detrich failed to plead the claim that trial counsel was ineffective for failing to challenge this testimony in his amended petition. We therefore do not consider this argument.

In addition, Detrich argues that the finding of gratuitous violence could have been rebutted by Dr. Briggs's testimony about his impulsivity:

> [H]ad counsel investigated Dave's biopsychosocial history and known of his impulsivity, counsel could have demonstrated that the sheer number of wounds did not demonstrate the vile state of mind necessary to support heinousness or depravity. Instead, counsel could have

demonstrated that Dave's involvement in the crime—whether he was the actual killer or an accomplice—reflected his inability to curb his impulses, change course of action midstream, and appreciate the natural consequences of his actions, and that all these conditions would be exacerbated by intoxication.

Dr. Briggs, however, was not the first mental health professional to document Detrich's impulsivity. Dr. Penn noted Detrich's "impulsive responses" and opined that Detrich "repeatedly acts in a self-sabotaging and self-destructive way." Dr. Zimmerman cited Detrich's "considerable poor judgment and poor impulse control," described Detrich as "an impulsive individual with poor judgment and a low tolerance for frustration," and noted that "when under stress [Detrich] may involve himself in acting-out behavior." Dr. Boyer reported that Detrich's score on the component of the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) test associated with impulsivity was not elevated, but she diagnosed him with probable antisocial personality disorder, which may be associated with impulsivity. *See Antisocial Personality Disorder*, *American Psychological Association Dictionary of Psychology* (updated Nov. 15, 2023), https://perma.cc/KD6A-JM5Y. She described Detrich as "someone with a potential for a serious loss of temper," who at times "has frightened others with his anger," and she cited the 1986 incident in which Detrich was charged with holding his wife at knifepoint and threatening to kill her.

Furthermore, it is unlikely that Souter's killing persuasively could have been portrayed as an impulsive act.

Detrich held a knife to Souter's throat, threatened her, forced her to the car, sexually assaulted her, stabbed her dozens of times, and disposed of her body. The trial court estimated that the drive alone consumed about fifteen minutes ("a substantial period of time") and covered seven to nine miles. In concluding that "the crime was not impulsive," the district court pointed out that Detrich "harassed and threatened the victim for a period of time before kidnapping her at knife point, removing her from the house to the car, and subsequently murdering her." *Detrich*, 2007 WL 4024551, at \*20. Like the state courts' cruelty finding, the finding that Detrich committed the crime in an especially heinous or depraved manner was not plausibly rebuttable.

### 5. *Enmund-Tison* Finding

Detrich argues that "[t]his same evidence challenging Charlton's version of events and demonstrating [Detrich's] impulsivity would have also undermined the *Enmund/Tison* finding" that Detrich "intended to kill the victim and in fact, alone killed the victim." Detrich's argument fails because, as we have explained, the crime was not impulsive. Furthermore, the state courts reasonably concluded that overwhelming evidence apart from Charlton's testimony established that Detrich, not Charlton, killed Souter: Winsett's testimony that Detrich held a knife to Souter's throat while at the house; Gwen Souter's testimony that Detrich threatened to kill Souter while at the house; Winsett's testimony that Charlton was driving; Carbonell's testimony that Detrich was covered in blood while Charlton had blood only on his right side; and Carbonell's testimony that Detrich confessed to the killing.

*          *          *

In sum, the Arizona Supreme Court's conclusion that Detrich was not prejudiced by trial counsel's allegedly deficient performance at sentencing did not involve an unreasonable application of *Strickland*.

## B.  Section 2254(d)(2)

Detrich alternatively contends that the Arizona Supreme Court's prejudice finding was based on one or more unreasonable determinations of fact.  We disagree.

### 1.  Evidentiary Development

Detrich argues that the state court's rejection of his penalty-phase ineffective assistance of counsel claim was based on an unreasonable determination of the facts because the state court declined to hold an evidentiary hearing on the claim.  "A state court's decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question."  *Hibbler*, 693 F.3d at 1147.  Detrich argues that a hearing was required to resolve "issues of material fact" but does not identify those facts.  His argument is therefore unpersuasive.

In the alternative, Detrich suggests that the state court's decision was based on an unreasonable determination of the facts because the state postconviction review court denied funding for a mitigation investigator.  Detrich, however, fails to explain how funding an investigator would have resulted in materially different factual findings.  Thus, even assuming that a state court's failure to fund a mitigation investigator could render the state court's factfinding process unreasonable under § 2254(d)(2), *cf. Jones v. Ryan*, 52 F.4th

1104, 1122 (9th Cir. 2022) ("The [state postconviction review] court's decision not to fund a defense mental health expert fatally undermined the fact-finding process, in part because that decision resulted in the court ruling on an unconstitutionally incomplete record."), *rev'd and remanded sub nom. Thornell v. Jones*, 602 U.S. 154 (2024), Detrich's cursory claim lacks merit.

## 2. Normal Neuropsychological Functioning

Next, Detrich contends that the state court's finding that "Dr. Briggs found that Petitioner's general neuropsychological functioning was normal and showed an absence of cognitive dysfunction" is an unreasonable determination of the facts. Detrich argues that this finding was objectively unreasonable because: (1) his performance on the General Neuropsychological Deficit Scale was "barely normal"; (2) his performance on two subtests of the Halstead-Reitan Neuropsychological Test Battery were in the brain-damaged range; and (3) Dr. Briggs's finding of normal neuropsychological functioning represented a "recovered picture."

Detrich's contention fails because the state court accurately summarized Dr. Briggs's findings. Even after taking Detrich's poor performance on the two component subtests into account, Dr. Briggs reported that Detrich performed "in the normal range of neuropsychological function" on the Halstead Impairment Index. The state court also correctly reported that Detrich's score on the General Neuropsychological Deficit Scale was "within the normal range (0–26)." The state court's failure to discuss the fact that Detrich's score fell near the low end of the normal range does not render the state court's factfinding objectively unreasonable, especially when Dr. Briggs made no

observations along those lines. *See Klein*, 146 S. Ct. at 597 ("The [court of appeals] held that the state appellate court applied the wrong rule because that court failed to discuss certain evidence that tended to undermine the State's case and because its analysis was not sufficiently 'nuanced.' That holding was a basic misapplication of AEDPA, which bars federal courts from imposing opinion-writing standards on state courts and demands that the relevant state-court decision be given the 'benefit of the doubt.'" (citation omitted) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam))). The state court's concise but accurate summary of Dr. Briggs's report was not objectively unreasonable.

Detrich faults the state court for failing to discuss the possibility that his neuropsychological functioning was below the normal range at the time of the crime (1989) or sentencing (1995) because his functioning was "barely" within the normal range at the time of Dr. Briggs's examination in 2000, and Dr. Briggs observed that Detrich's then-current neuropsychological functioning represented a "recovered picture." But Dr. Briggs was not retained to— and did not—offer an opinion as to Detrich's neuropsychological functioning in 1989 or 1995. He was retained in 2000 "to determine the patient's *current* intellectual and cognitive abilities and whether there are any neuropsychological deficits contributing to his *current* situation" (emphasis added). Dr. Briggs offered no opinion on Detrich's past neuropsychological functioning, and the state court was not required to read between the lines of Dr. Briggs's report to discern, and then affirmatively to comment on, findings that do not appear in the report itself. Furthermore, to the extent Detrich's neuropsychological functioning in 1989 or 1995 was at issue, Dr. Boyer's 1991

report is closest temporally. She concluded that Detrich's
"[c]ognitive functioning appeared grossly intact" and that
Detrich likely possessed "at least average intellectual
functioning"—suggesting that Detrich's recovery had been
achieved by that time.

### 3. Gurgling

Detrich next argues that the state court's rejection of
Sweedo's opinion on Souter's gurgling was objectively
unreasonable. During the state postconviction review
proceedings, Sweedo submitted a declaration stating:

> [T]here is cause to believe that after the
> victim in this case was slit from ear to ear, the
> wound penetrating all the way back to her
> neck bone, there is very little probability that
> the victim would have been engaging in
> conversation of any nature, and the
> possibility of any prolonged consciousness,
> after the removal of the oxygen supply to the
> brain of the victim would not be likely.

The trial court found fault with Sweedo's characterization of
the prosecution's evidence:

> Petitioner failed to present a colorable claim
> that his trial counsel was ineffective for
> failing to retain an expert to rebut the State
> pathologist's testimony that the victim could
> have made "gurgling" sounds in response to
> questioning by Petitioner, after sustaining
> knife wounds to her throat. Contrary to an
> affidavit submitted by Petitioner, there was
> no testimony that the victim "engaged in

conversation" or was conscious for a long period of time. The victim sustained four serious wounds to the neck, and it is merely speculative to assume that the victim's attempt to respond occurred after the most serious wound.

Detrich argues that the trial court "unreasonably found 'there was no testimony that the victim engaged in conversation or was conscious for a long period of time' and that it is 'merely speculative to assume that the victim's attempt to respond occurred after the more serious wound.'" We disagree. First, the trial court reasonably challenged Sweedo's exaggerated characterization of Charlton's testimony. Charlton testified that Souter made unintelligible gurgling sounds in response to Detrich's questioning, not that she "engaged in conversation." *See Detrich II*, 932 P.2d at 1331–32. Second, the trial court reasonably questioned Sweedo's characterization of Dr. Henry's testimony. Dr. Henry testified that Souter could have remained conscious for up to an hour if the wound to her abdomen were her only wound. But that was not her only wound, as Dr. Henry recognized. Dr. Henry testified that Souter would have *died* from her throat wound within fifteen or twenty minutes, likely sooner if combined with her other wounds. Although he testified that none of the three potentially fatal wounds would have rendered Souter *immediately* unconscious, he did not testify—and his testimony does not suggest—that Souter remained conscious for a prolonged period. Third, the trial court correctly pointed out that no evidence was offered regarding the order in which Souter's fatal wounds were inflicted.

### 4.  Overwhelming Evidence of Guilt

Finally, we reject Detrich's contention that the state court's decision was based on an unreasonable factual finding that "overwhelming evidence apart from Charlton's testimony supported the finding that [Detrich] committed the murder."  As noted earlier, strong evidence apart from Charlton's testimony supported the finding that Detrich killed Souter, including: Winsett's testimony that Detrich held a knife to Souter's throat while at the house; Gwen Souter's testimony that Detrich threatened to kill Souter while at the house; Winsett's testimony that Charlton was driving; Carbonell's testimony that Detrich was covered in blood while Charlton had blood only on his right side; and Carbonell's testimony that Detrich confessed to the killing. The state court's characterization of this evidence as "overwhelming" is not objectively unreasonable under § 2254(d)(2).

In sum, the Arizona Supreme Court's rejection of Detrich's sentencing-phase ineffective assistance of counsel claim neither involved an unreasonable application of *Strickland* nor was based on an unreasonable determination of the facts.  The district court properly denied relief on Claim B under § 2254(d).

### V.  Causal Nexus Claim (Claim D)

Detrich argues that the Arizona Supreme Court applied an unconstitutional causal nexus test to mitigation evidence at sentencing.[21]  The district court concluded that this claim was procedurally defaulted and that Detrich failed to

---

[21] In the district court, Detrich argued that both the trial court and the Arizona Supreme Court applied an unconstitutional causal nexus test. On appeal, Detrich has abandoned his claim regarding the trial court.

establish cause and prejudice under *Martinez* to excuse the default.  Alternatively, the district court rejected the claim on the merits and declined to grant a certificate of appealability.

A court of appeals may issue a certificate of appealability to review a district court's denial of habeas relief if the petitioner has "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327.

In *Eddings*, the Supreme Court held that, under the Eighth and Fourteenth Amendments, a sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence."  455 U.S. at 114.  "The sentencer, and the [state appellate court] on review, may determine the weight to be given relevant mitigating evidence.  But they may not give it no weight by excluding such evidence from their consideration."  *Id.* at 114–15.  In *McKinney*, 813 F.3d at 802, we concluded that, "[f]or a period of a little over 15 years in capital cases, in clear violation of *Eddings*, the Supreme Court of Arizona articulated and applied a 'causal nexus' test for nonstatutory mitigation that forbade as a matter of law giving weight to mitigating evidence, such as family background or mental condition, unless the background or mental condition was causally connected to the crime."  We held that the Arizona Supreme Court articulated and applied this test "from the late 1980s to the mid-2000s." *Id.* at 813.  *McKinney*, however, "resolved only the precise question whether the state court had applied the causal-nexus test in that specific case."  *Lee*, 118 F.4th at 993

(quoting *Greenway*, 866 F.3d at 1095–96). It "did not hold 'that Arizona had always applied' this unconstitutional test." *Id.* (quoting *Greenway*, 866 F.3d at 1095). "We 'therefore must examine the state court decisions in [Detrich's] case to determine whether they took into account all mitigating factors.'" *Id.* (quoting *Greenway*, 866 F.3d at 1096).

Detrich has not made a substantial showing that the Arizona Supreme Court applied an unconstitutional causal nexus test. Detrich points out that the prosecution articulated a causal nexus test at the aggravation-mitigation hearing by arguing that Detrich's abusive childhood was "not a mitigating circumstance" because it lacked a causal connection to the crime. But the Arizona Supreme Court did not adopt the prosecution's reasoning. On the contrary, both state courts expressly treated Detrich's abusive childhood as a mitigating factor. *See Detrich II*, 932 P.2d at 1338.

Alternatively, Detrich argues that the Arizona Supreme Court's failure to discuss certain mitigation evidence— Detrich's abusive childhood, his efforts to abstain from alcohol as an adult, and family support—implies that the court refused as a matter of law to give this evidence any mitigating weight. We disagree. First, the Arizona Supreme Court briefly discussed Detrich's abusive childhood as a mitigating circumstance. *Id.* A detailed discussion was not required. *See Miller-El*, 537 U.S. at 347 ("[A] state court need not make detailed findings addressing all the evidence before it."); *Moormann*, 426 F.3d at 1055 ("[T]he trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant.'" (quoting *Clark v. Ricketts*, 958 F.2d 851, 858 (9th Cir. 1991))). Second, Detrich did not proffer his alcohol-abstention efforts or family support as

mitigating factors. It is therefore unremarkable that the Arizona Supreme Court did not discuss them. Detrich's brief in the Arizona Supreme Court raised two mitigation-related arguments—that the trial court should have considered the disparity between Detrich's sentence and Charlton's and that the trial court erred in balancing the mitigating and aggravating factors. The Arizona Supreme Court discussed each of those arguments in its decision. *Detrich II*, 932 P.2d at 1339–40. It did not discuss potential mitigating factors that Detrich did not propose.

This case is indistinguishable from post-*McKinney* cases in which we have denied habeas relief on comparable facts. In *Lee*, 118 F.4th at 993–94, we rejected a causal nexus claim where "both the state trial court and high court considered Lee's deprived childhood as a mitigating factor" and the state courts neither recited a causal nexus test nor cited precedent articulating such a test. In *Apelt*, 878 F.3d at 839–40, we denied relief where the state courts did not state a factual conclusion that any of the petitioner's proffered mitigation failed to affect his conduct or cite decisions, such as *Ross*, 886 P.2d 1354, and *State v. Wallace*, 773 P.2d 983 (Ariz. 1989), articulating an unconstitutional causal nexus test. In *Greenway*, 866 F.3d at 1096–97, we rejected a causal nexus claim where the petitioner's case was not among the decisions *McKinney* identified as involving an unconstitutional causal nexus test and "[t]he Arizona Supreme Court's opinion, on its face, . . . does not expressly exclude any mitigation evidence or claim on the ground that it lacked causal relationship to the commission of the crime."

Because Detrich has not made a substantial showing of the denial of a constitutional right, we deny a certificate of appealability on this claim.

\*          \*          \*

The judgment of the district court is **AFFIRMED**.

NGUYEN, Circuit Judge, concurring for the most part and concurring in the judgment:

I concur in the majority opinion in all but one respect. The majority states that "[t]o establish 'prejudice' under *Martinez*, the underlying trial counsel ineffective assistance of counsel claim must also be 'a substantial one, which is to say that the claim has some merit.'" Maj. Op. at 36 (simplified) (quoting *Michaels v. Davis*, 51 F.4th 904, 931 (9th Cir. 2022)). I continue to adhere to my previously expressed view that *Martinez* is a specific application of *Coleman*'s cause requirement for overcoming procedural default and does not replace *Coleman*'s actual prejudice requirement with a substantiality test. *See Detrich v. Ryan*, 740 F.3d 1237, 1261 (9th Cir. 2013) (en banc) (Nguyen, J., concurring in the result); *see also Shinn v. Ramirez*, 596 U.S. 366, 379–80 (2022) (explaining that under *Martinez*, "ineffective assistance of state postconviction counsel may constitute 'cause' to forgive procedural default of a trial-ineffective-assistance claim" and that the prejudice showing is "not merely a substantial federal claim").

Here, however, the prejudice standard makes no difference. A petitioner who cannot show "some merit" to the underlying claim that trial counsel was ineffective necessarily cannot show that "the constitutional violation 'worked to his *actual* and substantial disadvantage.'" *Ramirez*, 596 U.S. at 379–80 (quoting *Murray v. Carrier*,

477 U.S. 478, 494 (1986)).  Therefore, I also concur in the judgment.